# UNITED STATES *v.* RAMSEY ET AL.

No. 76–167.   Argued March 30, 1977—Decided June 6, 1977

*Kenneth S. Geller* argued the cause for the United States. On the brief were *Solicitor General Bork, Assistant Attorney General Thornburgh,* and *Jerome M. Feit.*

*Allan M. Palmer* argued the cause and filed a brief for respondent Ramsey. *Irving R. M. Panzer,* by appointment of the Court, 429 U. S. 916, argued the cause and filed a brief for respondent Kelly.*

MR. JUSTICE REHNQUIST delivered the opinion of the Court.

Customs officials, acting with "reasonable cause to suspect" a violation of customs laws, opened for inspection incoming international letter-class mail without first obtaining a search warrant. A divided Court of Appeals for the District of Co-

---

*Melvin L. Wulf, Joel M. Gora,* and *Jack D. Novik* filed a brief for the American Civil Liberties Union as *amicus curiae* urging affirmance.

lumbia Circuit held, contrary to every other Court of Appeals which has considered the matter,[1] that the Fourth Amendment forbade the opening of such mail without probable cause and a search warrant. 176 U. S. App. D. C. 67, 538 F. 2d 415. We granted the Government's petition for certiorari to resolve this Circuit conflict. 429 U. S. 815. We now reverse.

# I

Charles W. Ramsey and James W. Kelly jointly commenced a heroin-by-mail enterprise in the Washington, D. C., area. The process involved their procuring of heroin, which was mailed in letters from Bangkok, Thailand, and sent to various locations in the District of Columbia area for collection. Two of their suppliers, Sylvia Bailey and William Ward, who were located in West Germany, were engaged in international narcotics trafficking during the latter part of 1973 and the early part of 1974. West German agents, pursuant to court-authorized electronic surveillance, intercepted several trans-Atlantic conversations between Bailey and Ramsey during which their narcotics operation was discussed. By late January 1974, Bailey and Ward had gone to Thailand. Thai

---

[1] Several Courts of Appeals have held that international letter-class mail may be opened, pursuant to a border search, without probable cause and without a warrant. *United States* v. *Milroy,* 538 F. 2d 1033 (CA4), cert. denied, 426 U. S. 924 (1976); *United States* v. *King,* 517 F. 2d 350 (CA5 1975); *United States* v. *Barclift,* 514 F. 2d 1073 (CA9), cert. denied, 423 U. S. 842 (1975); *United States* v. *Bolin,* 514 F. 2d 554 (CA7 1975); *United States* v. *Odland,* 502 F. 2d 148 (CA7), cert. denied, 419 U. S. 1088 (1974). Several other Courts of Appeals, in approving the warrantless opening of mailed packages crossing the borders, have indicated that the opening of international letter-class mail should be governed by the same standards. *United States* v. *Doe,* 472 F. 2d 982 (CA2), cert. denied, *sub nom. Rodriguez* v. *United States,* 411 U. S. 969 (1973); *United States* v. *Beckley,* 335 F. 2d 86 (CA6 1964), cert. denied, *sub nom. Stone* v. *United States,* 380 U. S. 922 (1965). The First Circuit has reserved the question of letters. *United States* v. *Emery,* 541 F. 2d 887, 888–889 (1976).

officials, alerted to their presence by West German authorities, placed them under surveillance. Ward was observed mailing letter-sized envelopes in six different mail boxes; five of these envelopes were recovered; and one of the addresses in Washington, D. C., was later linked to respondents. Bailey and Ward were arrested by Thai officials on February 2, 1974; among the items seized were eleven heroin-filled envelopes addressed to the Washington, D. C., area, and later connected with respondents.

Two days after this arrest of Bailey and Ward, Inspector George Kallnischkies, a United States customs officer in New York City, without any knowledge of the foregoing events, inspecting a sack of incoming international mail from Thailand, spotted eight envelopes that were bulky and which he believed might contain merchandise.[2] The envelopes, all of which appeared to him to have been typed on the same typewriter, were addressed to four different locations in the Washington, D. C., area. Inspector Kallnischkies, based on the fact that the letters were from Thailand, a known source of narcotics, and were "rather bulky," suspected that the envelopes might contain merchandise or contraband rather than correspondence. He took the letters to an examining area in the post office, and felt one of the letters: It "felt like there was something in there, in the envelope. It was not just plain paper that the envelope is supposed to contain." He weighed one of the envelopes, and found it weighed 42 grams, some three to six times the normal weight of an airmail letter. Inspector Kallnischkies then opened that envelope:[3]

> "In there I saw some cardboard and between the cardboard, if I recall, there was a plastic bag containing a

---

[2] The mail was inspected at the General Post Office in New York City, where incoming international air mail landing at Kennedy Airport is taken for routing and customs inspections. There is no dispute that this is the "border" for purposes of border searches, see n. 11, *infra*.

[3] Inspector Kallnischkies also testified that his "normal procedure," when

white powdered substance, which, based on experience, I knew from Thailand would be heroin.

"I went ahead and removed a sample. Gave it a field test, a Marquis Reagent field test, and I had a positive reaction for heroin." App. 32.

He proceeded to open the other seven envelopes which "in a lot of ways were identical"; examination revealed that at least the contents were in fact identical: each contained heroin.

The envelopes were then sent to Washington in a locked pouch where agents of the Drug Enforcement Administration, after obtaining a search warrant, opened the envelopes again and removed most of the heroin.[4] The envelopes were then resealed, and six of them were delivered under surveillance. After Kelly collected the envelopes from the three different addressees, rendezvoused with Ramsey, and gave Ramsey a brown paper bag, federal agents arrested both of them. The bag contained the six envelopes with heroin, $1,100 in cash, and "cutting" material for the heroin. The next day, in executing a search upon warrant of Ramsey's residence, agents recovered, *inter alia*, two pistols.

Ramsey and Kelly were indicted, along with Bailey and Ward, in a 17-count indictment.[5] Respondents moved to

---

examining envelopes from certain countries which were of a certain weight and bulkiness, was to "shake it a little," and "if it moves, I know there is something in there that is not correspondence. It is merchandise and I have to open it to check it out." App. 48–49. He was unable to specifically recall, however, whether or not he had followed the "normal procedure" in this case.

[4] The Government does not seek to justify the original discovery of the heroin on the basis of this warrant: "[A] post-opening warrant obviously does not justify the original opening." Brief for United States 4 n. 2. We accordingly accord no significance to the obtaining of this subsequent warrant.

[5] Bailey and Ward, although indicted, were not tried, as they have remained outside the United States.

suppress the heroin and the two pistols.[6]   The District Court denied the motions, and after a bench trial on the stipulated record, respondents were found guilty and sentenced to imprisonment for what is in effect a term of 10 to 30 years. The Court of Appeals for the District of Columbia Circuit, one judge dissenting, reversed the convictions, holding that the "border search exception to the warrant requirement" applicable to persons, baggage, and mailed packages did not apply to the routine opening of international letter mail, and held that the Constitution requires that "before international letter mail is opened, a showing of probable cause be made to and a warrant secured from a neutral magistrate."   176 U. S. App. D. C., at 73, 538 F. 2d, at 421.[7]

## II

Congress and the applicable postal regulations authorized the actions undertaken in this case.   Title 19 U. S. C. § 482, a recodification of Rev. Stat. § 3061, and derived from § 3 of the Act of July 18, 1866, 14 Stat. 178, explicitly deals with the search of an "envelope":

> "Any of the officers or persons authorized to board or search vessels may . . . search any trunk or envelope, wherever found, in which he may have a reasonable cause to suspect there is merchandise which was imported contrary to law . . . ."

This provision authorizes customs officials to inspect, under

---

[6] The Government acknowledges that "[t]he weapons were found as a result of respondents' arrests and so are 'fruit' of the discovery of the heroin.   The convictions consequently must stand or fall with the heroin offenses."   *Id.*, at 5 n. 4.

[7] Neither court below considered whether Ramsey or Kelly had standing to object to the opening of the envelopes in light of the fact that none of the envelopes were addressed to them.   The Government, however, did not raise the issue below, and consequently we do not reach it.   *United States* v. *Santana*, 427 U. S. 38, 41 n. 2 (1976).

the circumstances therein stated, incoming international mail.[8] The "reasonable cause to suspect" test adopted by the statute is, we think, a practical test which imposes a less stringent

---

[8] Postal regulations have implemented this authority. See 19 CFR § 145.2 (1976); 39 CFR § 61.1 (1975). The regulations were promulgated in 1971; prior to that time existing regulations did not implement the statutory authority. The fact that postal authorities did not open incoming international letter-class mail upon "reasonable cause to suspect" prior to 1971 does not change our analysis.

Title 39 U. S. C. § 3623 (d), which prohibits the opening of first-class mail of "domestic origin," "except under authority of a search warrant authorized by law . . . ," has, by its own terms, no application to international mail of any class. A proposed amendment, which would have imposed similar statutory requirements on the opening of international mail, was defeated on the floor of the House, 116 Cong. Rec. 20482–20483 (1970).

Our dissenting Brethren find no fewer than five separate reasons for refusing to follow the unambiguous language of the statutory section. The first is the longstanding respect Congress has shown for "the individual's interest in private communication." *Post,* at 626. But as we examine it, *infra,* at 616–619, no such support may be garnered from the history of the Fourth Amendment insofar as border searches are concerned. Insofar as they rely on the First Amendment, they ignore the limitations imposed on the search by the statute, *infra,* at 623–624, as well as by the regulations. Postulating a sensitive concern for First Amendment values as of 1866 is a difficult historical exercise on the basis of available materials from that time. Cf. *Ex parte Jackson,* 96 U. S. 727 (1878) (Fourth Amendment analysis only). Most puzzling of all, however, is the dissent's reliance on the defeated amendment, offered in 1970, when there is no dearth of available materials, which would have imposed a specific warrant requirement on the opening of international letter-class mail. Contrary to the tenor of the dissent, the amendment was defeated, not passed. The one bit of legislative history the dissent quotes, a statement of Congressman Derwinski, reflects only the concern that with the amendment " 'the problem of stopping the flow of narcotics and pornography would be greatly compounded.' " *Post,* at 626 n. 2. We do not see how any solace whatever for the dissenting position may be derived from this sort of legislative history.

The dissent also relies on a brief colloquy on the floor of the Senate during the debate on the 1866 Act. The colloquy is notable both for its brevity and for its ambiguity. It does not distinguish between

requirement than that of "probable cause" imposed by the Fourth Amendment as a requirement for the issuance of warrants. See *United States* v. *King,* 517 F. 2d 350, 352

mailed packages and mailed letters; it refers generally to the " 'examination of . . . the United States mails.' " *Post,* at 627. Yet, by that time, the "mail" encompassed both. See 12 Stat. 704. (To the extent the colloquy was meant to encompass *any* intrusion on the "mails," the statute has long since been interpreted otherwise. *Cotzhausen* v. *Nazro,* 107 U. S. 215, 219 (1883).) Perhaps because of its brevity, the colloquy does not distinguish between domestic and international mail, nor does it distinguish between the searching of envelopes for contraband and the possible reading of enclosed communications. It explicitly manifests a concern with § 2 as well as with § 3 of the bill. But § 2 allowed customs inspectors "to go on board of any vessel . . . and to inspect, search, and examine the same, and any person, trunk, or envelope on board . . . ." Section 3, however, contains a "reasonable cause to suspect" requirement that is not found in § 2, and the colloquy may have simply referred to a concern about the wholesale opening, and reading, of letters. Cf. Cong. Globe 39th Cong., 1st Sess., 3440–3441 (1866). The colloquy by no means indicates to us that Congress was concerned only with detecting smuggling that would be carried in "trunk"-sized packages. It is at best insufficient to overcome the precise and clear statutory language Congress actually enacted.

The dissent additionally relies on the language of the statute in its entirety as demonstrating a concern only with "packages of the kind normally used to import dutiable merchandise." *Post,* at 628. But this assertion—assuming we as judges know what size packages dutiable merchandise *usually* comes in—is wholly contrary to the thrust of the purpose, and the language, of the Act. The purpose of the Act is "to Prevent Smuggling." Nowhere does this purpose, however and wherever articulated, reflect a concern with the physical size of the container employed in smuggling, nor do we possess any reliable indication that only large items were smuggled into this country in 1866. As for the word "envelope," it is difficult to see how our dissenting Brethren derive comfort from its use in the statute. The contemporary dictionary source they cite states that the most common use of the word "envelope" is in the sense of " 'the cover or wrapper of a document, as of a letter.' " *Post,* at 630 n. 5. We are quite unable to see how this, the most common usage of the word, reinforces the view that Congress intended only a narrow definition when it used the word without restriction.

The dissent also relies on a "consistent construction" over 105

(CA5 1975); cf. *Terry* v. *Ohio,* 392 U. S. 1, 8, 21–22, 27 (1968). Inspector Kallnischkies, at the time he opened the letters, knew that they were from Thailand, were bulky, were many times the weight of a normal airmail letter, and "felt like there was something in there." Under these circumstances, we have no doubt that he had reasonable "cause to suspect" that there was merchandise or contraband in the envelopes.[9]

---

years by the Executive. *Post,* at 631. To the extent it relies on a construction that things entering by mail are not covered by the statute, this reliance founders on the opinion of a former Acting Attorney General. See 18 Op. Atty. Gen. 457 (1886). To the extent it is referring only to letter-sized mail, the dissent nowhere demonstrates *any* actual interpretation by anyone that the congressional authority was perceived as an affirmative limitation on the power of the Executive to open letters at the border when there existed "reasonable cause" to suspect a violation of customs laws. The evidence marshaled by our dissenting Brethren on this point could be called "consistent" only by the most generous appraiser of such material.

The dissent's final reliance is on the assertion that asking the addressee for consent to open a letter had not been proved unworkable. Presumably the conclusion to be drawn from this is that the Executive's reason for a change in its policy is weak. But this is beside the point; it reflects not at all on Congress' words or intent in 1866 or at any other time. That the Executive Branch may have relied on a less-than-cogent reason in its 1971 regulatory change has nothing to do with the interpretation of an Act of Congress.

Underlying all of these reasons, apparently, is the fear that "[i]f the Government is allowed to exercise the power it claims, the door will be open to the wholesale, secret examination of all incoming international letter mail." *Post,* at 632. That specter is simply not presented by this case. As we observe, *infra,* at 623–624, the opening of mail is limited by a "reasonable cause" requirement, while the reading of letters is totally interdicted by regulation. It is this unwarranted speculation, and not the policy followed by the Executive, that poses the "serious constitutional question" to be avoided.

[9] The Court of Appeals, it should be noted, evidently believed that Inspector Kallnischkies possessed sufficient information at the time the envelopes were opened to meet the stricter "probable cause" requirement;

The search, therefore, was plainly authorized by the statute.[10]

Since the search in this case was authorized by statute, we are left simply with the question of whether the search, nevertheless violated the Constitution. Cf. *United States* v. *Brignoni-Ponce,* 422 U. S. 873, 877 (1975). Specifically, we need not decide whether Congress conceived the statute as a necessary precondition to the validity of the search or whether it was viewed, instead, as a limitation on otherwise existing authority of the Executive.[11]  Having acted pursuant to, and

it believed "that the facts in this case are such that, had they been presented to a magistrate, issuance of a search warrant permitting opening of the envelopes would have been appropriate." 176 U. S. App. D. C. 67, 73 n. 8, 538 F. 2d 415, 421 n. 8. Because of our disposition of this case, we do not reach that question.

[10] In light of our conclusion that there existed "reasonable cause to suspect" a violation of the customs laws, we need not, and do not, decide whether the search would have nonetheless been authorized by other statutory grants of authority urged alternatively upon us by the Government. Title 19 U. S. C. § 482 also authorizes customs officials to "stop, search, and examine . . . any vehicle, beast, or person, on which or whom . . . they shall suspect there is merchandise which is subject to duty, or shall have been introduced into the United States in any manner contrary to law, whether by the person in possession or charge, or by, in, or upon such vehicle or beast, or otherwise . . . ." Title 19 U. S. C. § 1582 provides, in pertinent part, that "[t]he Secretary of the Treasury may prescribe regulations for the search of persons and baggage . . . ; and all persons coming into the United States from foreign countries shall be liable to detention and search by authorized officers or agents of the Government under such regulations."

[11] Although the statutory authority authorizes searches of envelopes "wherever found," 19 U. S. C. § 482, the envelopes were searched at the New York City Post Office as the mail was entering the United States. We, therefore, do not have before us the question, recently addressed in other contexts, of the geographical limits to border searches. See *United States* v. *Brignoni-Ponce,* 422 U. S. 873 (1975); *Almeida-Sanchez* v. *United States,* 413 U. S. 266 (1973). Nor do we need to decide whether the broad statutory authority subjects such mail to customs inspection at a place other than the point of entry into this country. See *United States* v. *King,* 517 F. 2d, at 354 ("[T]he envelopes had passed

within the scope of, a congressional Act, Inspector Kallnisch-kies' searches were permissible unless they violated the Constitution.

### III

### A

That searches made at the border, pursuant to the long-standing right of the sovereign to protect itself by stopping and examining persons and property crossing into this country, are reasonable simply by virtue of the fact that they occur at the border, should, by now, require no extended demonstration. The Congress which proposed the Bill of Rights, including the Fourth Amendment, to the state legislatures on September 25, 1789, 1 Stat. 97, had, some two months prior to that proposal, enacted the first customs statute, Act of July 31, 1789, c. 5, 1 Stat. 29. Section 24 of this statute granted customs officials "full power and authority" to enter and search "any ship or vessel, in which they shall have reason to suspect any goods, wares or merchandise subject to duty shall be concealed . . . ." This acknowledgment of plenary customs power was differentiated from the more limited power to enter and search "any particular dwelling-house, store, building, or other place . . ." where a warrant upon "cause to suspect" was required.[12] The historical importance of the

---

an initial stage in the customs process when they were routed to Alabama, but they were still in the process of being delivered, and still subject to customs inspection").

[12] Section 23 of this customs statute provided, in pertinent part:

"[I]t shall be lawful for the collector, or other officer of the customs, after entry made of any goods, wares or merchandise, on suspicion of fraud, to open and examine, in the presence of two or more reputable merchants, any package or packages thereof . . . ."

Section 24 of this customs statute provided, in pertinent part:

"[E]very collector, naval officer and surveyor, or other person specially appointed by either of them for that purpose, shall have full power and authority, to enter any ship or vessel, in which they shall have

enactment of this customs statute by the same Congress which proposed the Fourth Amendment is, we think, manifest. This Court so concluded almost a century ago. In *Boyd* v. *United States,* 116 U. S. 616, 623 (1886), this Court observed:

> "The seizure of stolen goods is authorized by the common law; and the seizure of goods forfeited for a breach of the revenue laws, or concealed to avoid the duties payable on them, has been authorized by English statutes for at least two centuries past; and the like seizures have been authorized by our own revenue acts from the commencement of the government. The first statute passed by Congress to regulate the collection of duties, the act of July 31, 1789, 1 Stat. 29, 43, contains provisions to this effect. *As this act was passed by the same Congress which proposed for adoption the original amendments to the Constitution, it is clear that the members of that body did not regard searches and seizures of this kind as 'unreasonable,' and they are not embraced within the prohibition of the amendment."* (Emphasis supplied.)

This interpretation, that border searches were not subject to the warrant provisions of the Fourth Amendment and were "reasonable" within the meaning of that Amendment, has been faithfully adhered to by this Court. *Carroll* v. *United States,* 267 U. S. 132 (1925), after noting that "[t]he Fourth Amend-

---

reason to suspect any goods, wares or merchandise subject to duty shall be concealed; and therein to search for, seize, and secure any such goods, wares or merchandise; and if they shall have cause to suspect a concealment thereof, in any particular dwelling-house, store, building, or other place, they or either of them shall, upon application on oath or affirmation to any justice of the peace, be entitled to a warrant to enter such house, store, or other place (in the day time only) and there to search for such goods, and if any shall be found, to seize and secure the same for trial . . . ."

ment does not denounce all searches or seizures, but only such as are unreasonable," *id.,* at 147, recognized the distinction between searches within this country, requiring probable cause, and border searches, *id.,* at 153–154:

> "It would be intolerable and unreasonable if a prohibition agent were authorized to stop every automobile on the chance of finding liquor and thus subject all persons lawfully using the highways to the inconvenience and indignity of such a search. *Travellers may be so stopped in crossing an international boundary because of national self protection reasonably requiring one entering the country to identify himself as entitled to come in, and his belongings as effects which may be lawfully brought in.* But those lawfully within the country . . . have a right to free passage without interruption or search unless there is known to a competent official authorized to search, probable cause for believing that their vehicles are carrying contraband or illegal merchandise." [13]    (Emphasis supplied.)

More recently, we noted this longstanding history in *United States* v. *Thirty-seven Photographs,* 402 U. S. 363, 376 (1971):

> "But a port of entry is not a traveler's home. His right to be let alone neither prevents the search of his luggage nor the seizure of unprotected, but illegal, materials when his possession of them is discovered during such a search. Customs officials characteristically inspect luggage and their power to do so is not questioned in this case; it is an old practice and is intimately associated with excluding illegal articles from the country."

---

[13] We do not decide whether, and under what circumstances, a border search might be deemed "unreasonable" because of the particularly offensive manner in which it is carried out. Cf. *Kremen* v. *United States,* 353 U. S. 346 (1957); *Go-Bart Importing Co.* v. *United States,* 282 U. S. 344, 356–358 (1931)

In *United States* v. *12 200-Ft. Reels of Film,* 413 U. S. 123, 125 (1973), we observed: "Import restrictions and searches of persons or packages at the national borders rest on different considerations and different rules of constitutional law from domestic regulations. The Constitution gives Congress broad, comprehensive powers '[t]o regulate Commerce with foreign Nations.' Art. I, § 8, cl. 3. Historically such broad powers have been necessary to prevent smuggling and to prevent prohibited articles from entry." Finally, citing *Carroll* and *Boyd,* this Court stated in *Almeida-Sanchez* v. *United States,* 413 U. S. 266, 272 (1973), that it was "without doubt" that the power to exclude aliens "can be effectuated by routine inspections and searches of individuals or conveyances seeking to cross our borders." See also *id.,* at 288 (WHITE, J., dissenting).

Border searches, then, from before the adoption of the Fourth Amendment, have been considered to be "reasonable" by the single fact that the person or item in question had entered into our country from outside. There has never been any additional requirement that the reasonableness of a border search depended on the existence of probable cause. This longstanding recognition that searches at our borders without probable cause and without a warrant are nonetheless "reasonable" has a history as old as the Fourth Amendment itself.[14] We reaffirm it now.

### B

Respondents urge upon us, however, the position that mailed letters are somehow different, and, whatever may be the normal rule with respect to border searches, different considerations, requiring the full panoply of Fourth Amend-

---

[14] The opinion in *Carroll* v. *United States,* 267 U. S. 132, 149 (1925), itself reminds us that "[t]he Fourth Amendment is to be construed in the light of what was deemed an unreasonable search and seizure when it was adopted, and in a manner which will conserve public interests as well as the interests and rights of individual citizens."

ment protections, apply to international mail. The Court of Appeals agreed, and felt that whatever the rule may be with respect to travelers, their baggage, and even mailed packages, it would not "extend" the border-search exception to include mailed letter-size envelopes. 176 U. S. App. D. C., at 73, 538 F. 2d, at 421. We do not agree that this inclusion of letters within the border-search exception represents any "extension" of that exception.

The border-search exception is grounded in the recognized right of the sovereign to control, subject to substantive limitations imposed by the Constitution, who and what may enter the country. It is clear that there is nothing in the rationale behind the border-search exception which suggests that the mode of entry will be critical. It was conceded at oral argument that customs officials could search, without probable cause and without a warrant, envelopes carried by an entering traveler, whether in his luggage or on his person. Tr. of Oral Arg. 43–44. Surely no different constitutional standard should apply simply because the envelopes were mailed, not carried. The critical fact is that the envelopes cross the border and enter this country, not that they are brought in by one mode of transportation rather than another. It is their entry into this country from without it that makes a resulting search "reasonable."

Almost a century ago this Court rejected such a distinction in construing a protocol to the Treaty of Berne, 19 Stat. 604, which prohibited the importation of letters which might contain dutiable items. *Cotzhausen* v. *Nazro,* 107 U. S. 215 (1883). Condemning the unsoundness of any distinction between entry by mail and entry by other means, Mr. Justice Miller, on behalf of a unanimous Court, wrote, *id.,* at 218:

> "Of what avail would it be that every passenger, citizen and foreigner, without distinction of country or sex, is compelled to sign a declaration before landing, either

that his trunks and satchels in hand contain nothing liable to duty, or if they do, to state what it is, and even the person may be subjected to a rigid examination, if the mail is to be left unwatched, and all its sealed contents, even after delivery to the person to whom addressed, are to be exempt from seizure, though laces, jewels, and other dutiable matter of great value may thus be introduced from foreign countries."

The historically recognized scope of the border-search doctrine, suggests no distinction in constitutional doctrine stemming from the mode of transportation across our borders. The contrary view of the Court of Appeals and respondents stems, we think, from an erroneous reading of *Carroll* v. *United States,* 267 U. S., at 153, under which the Court of Appeals reasoned that "the rationale of the border search exception . . . is based upon . . . the difficulty of obtaining a warrant when the subject of the search is mobile, as a car or person . . . ." 176 U. S. App. D. C., at 70, 538 F. 2d, at 418.[15]

The fundamental difficulty with this position is that the "border search" exception is not based on the doctrine of "exigent circumstances" at all. It is a longstanding, historically recognized exception to the Fourth Amendment's general principle that a warrant be obtained, and in this respect is like the similar "search incident to lawful arrest" exception treated in *United States* v. *Robinson,* 414 U. S. 218, 224 (1973). We think that the language in *Carroll* v. *United States, supra,* makes this point abundantly clear. The *Carroll* Court

---

[15] This explanation does not, and cannot, fully explain the border-search "exception" even if it were grounded in the "exigent circumstances" doctrine. For a letter may as easily be held by customs officials when it crosses with a traveler as it can when it crosses in the mail. Too, this explanation cannot explain the different treatment which the Court of Appeals apparently would have accorded mailed packages, which presumably may be detained as easily as letter-size envelopes.

quoted verbatim the above-quoted language from *Boyd* v. *United States,* 116 U. S. 616 (1886), including the reference to customs searches and seizures of the kind authorized by 1 Stat. 29, 43, as being neither "unreasonable" nor "embraced within the prohibition of the [Fourth] [A]mendment." Later in the opinion, the Court commented that having "established that contraband goods concealed and illegally transported in an automobile or other vehicle may be searched for *without a warrant,* we come now to consider under what circumstances such search may be made." 267 U. S., at 153 (emphasis supplied). It then, in the passage quoted *supra,* at 618, distinguished, among these types of searches which required no warrant, those which required *probable cause* from those which did not: border searches did not; vehicular searches inside the country did. *Carroll* thus recognized that there was no "probable cause" requirement at the border. This determination simply has nothing to do with "exigent circumstances."

The Court of Appeals also relied upon what it described as this Court's refusal in recent years twice "to take an expansive view of the border search exception or the authority of the Border Patrol. See *United States* v. *Brignoni-Ponce,* 422 U. S. 873 . . . (1975); *Almeida-Sanchez* v. *United States,* 413 U. S. 266 . . . (1973)." 176 U. S. App. D. C., at 72, 538 F. 2d, at 420. But, as the language from each of these opinions suggests, 422 U. S., at 876, 884; 413 U. S., at 272–273, plenary border-search authority was not implicated by our refusal to uphold searches and stops made at places in the interior of the country; the express premise for each holding was that the checkpoint or stop in question was not the border or its "functional equivalent."

In view of the wealth of authority establishing the border search as "reasonable" within the Fourth Amendment even though there be neither probable cause nor a warrant, we reject the distinctions made by the Court of Appeals in its opinion.

Nor do we agree that, under the circumstances presented by this case, First Amendment considerations dictate a full panoply of Fourth Amendment rights prior to the border search of mailed letters. There is, again, no reason to distinguish between letters mailed into the country, and letters carried on the traveler's person.[16] More fundamentally, however, the existing system of border searches has not been shown to invade protected First Amendment rights,[17] and hence there is no reason to think that the potential presence of correspondence makes the otherwise constitutionally reasonable search "unreasonable."

The statute in question requires that there be "reasonable cause to believe" the customs laws are being violated prior to the opening of envelopes. Applicable postal regulations flatly prohibit, under all circumstances, the reading of correspondence absent a search warrant, 19 CFR § 145.3 (1976):

> "No customs officer or employee shall read or authorize or allow any other person to read any correspondence contained in sealed letter mail of foreign origin unless a search warrant has been obtained in advance from an appropriate judge or U. S. magistrate which authorizes such action."

Cf. 18 U. S. C. § 1702.

We are unable to agree with the Court of Appeals that the opening of international mail in search of customs violations,

---

[16] There is no reason to infer that mailed letters somehow carry with them a greater expectation of privacy than do letters carried on one's person. Cf. 39 U. S. C. § 3623 (d).

[17] There are limited justifiable expectations of privacy for incoming material crossing United States borders. Not only is there the longstanding, constitutionally authorized right of customs officials to search incoming persons and goods, but there is no statutorily created expectation of privacy. See 39 U. S. C. § 3623 (d). See also *United States* v. *King*, 517 F. 2d, at 354; *United States* v. *Odland*, 502 F. 2d 148 (CA7), cert. denied, 419 U. S. 1088 (1974); *United States* v. *Doe*, 472 F. 2d, at 985.

under the above guidelines, impermissibly chills the exercise of free speech. Accordingly, we find it unnecessary to consider the constitutional reach of the First Amendment in this area in the absence of the existing statutory and regulatory protection.[18] Here envelopes are opened at the border only when the customs officers have reason to believe they contain other than correspondence, while the reading of any correspondence inside the envelopes is forbidden. Any "chill" that might exist under these circumstances may fairly be considered not only "minimal," *United States* v. *Martinez-Fuerte,* 428 U. S. 543, 560, 562 (1976); cf. *United States* v. *Biswell,* 406 U. S. 311, 316–317 (1972), but also wholly subjective.[19]

We therefore conclude that the Fourth Amendment does not interdict the actions taken by Inspector Kallnischkies in

---

[18] We, accordingly, have no occasion to decide whether, in the absence of the regulatory restrictions, speech would be "chilled," or, if it were, whether the appropriate response would be to apply the full panoply of Fourth Amendment requirements. Cf. *Roaden* v. *Kentucky,* 413 U. S. 496, 502–506 (1973); *Terry* v. *Ohio,* 392 U. S. 1, 19 (1968); *Stanford* v. *Texas,* 379 U. S. 476, 485 (1965).

[19] In *Wolff* v. *McDonnell,* 418 U. S. 539 (1974), this Court, in the context of the opening of mail from an attorney to a prisoner-client, noted that "freedom from censorship is not equivalent to freedom from inspection or perusal," *id.,* at 576. This Court held:

"As to the ability to open the mail in the presence of inmates, this could in no way constitute censorship; since the mail would not be read. Neither could it chill such communications, since the inmate's presence insures that prison officials will not read the mail. The possibility that contraband will be enclosed in letters, even those from apparent attorneys, surely warrants prison officials' opening the letters." *Id.,* at 577.

We deal here, of course, with borders, not prisons. Yet the power of customs officials to take plenary action to stop the entry of contraband is no less in the border-search area than in prisons. The safeguards in the border-search area, we think, are comparable to those found constitutionally valid in *Wolff.*

opening and searching the eight envelopes. The judgment of the Court of Appeals is, therefore,

*Reversed.*

MR. JUSTICE POWELL, concurring.

The statute at issue expressly authorizes customs officials to "search any . . . envelope" at the border where there is "reasonable cause to suspect" the importation of contraband. 19 U. S. C. § 482. In view of the necessarily enhanced power of the Federal Government to enforce customs laws at the border, I have no doubt that this statute—requiring as a precondition to the opening of mail "reasonable cause to suspect" a violation of law—adequately protects both First and Fourth Amendment rights.*

I therefore join in the judgment of the Court. On the understanding that the precedential effect of today's decision does not go beyond the validity of mail searches at the border pursuant to the statute, I also join the opinion of the Court.

MR. JUSTICE STEVENS, with whom MR. JUSTICE BRENNAN and MR. JUSTICE MARSHALL join, dissenting.

The decisive question in this case is whether Congress has granted customs officials the authority to open and inspect personal letters entering the United States from abroad without the knowledge or consent of the sender or the addressee, and without probable cause to believe the mail contains contraband or dutiable merchandise.

In 1971 the Department of the Treasury and the Post Office Department first asserted that Congress had granted such authority in an awkwardly drafted statute enacted in 1866.

---

*As the Court notes, *ante,* at 623, postal regulations flatly prohibit the reading of "any correspondence contained in sealed letter mail of foreign origin unless a search warrant has been obtained . . . ." 19 CFR § 145.3 (1976).

Under the earlier practice, which had been consistently followed for 105 years, customs officials were not allowed to open foreign mail except in the presence, and with the consent, of the addressees,[1] unless of course a warrant supported by probable cause had been first obtained. There are five reasons why I am convinced that Congress did not authorize the kind of secret searches of private mail that the Executive here conducted.

First, throughout our history Congress has respected the individual's interest in private communication. The notion that private letters could be opened and inspected without notice to the sender or the addressee is abhorrent to the tradition of privacy and freedom to communicate protected by the Bill of Rights. I cannot believe that any member of the Congress would grant such authority without considering its constitutional implications.[2]

---

[1] This was the procedure followed by the customs officials in *Cotzhausen* v. *Nazro*, 107 U. S. 215, relied upon by the Government here. For 100 years, from 1871 to 1971, Post Office Regulations allowed incoming international letter mail to be opened only in the presence, and with the consent, of the addressee. Brief for United States 20–21, nn. 12a, 14 (citing regulations).

[2] This conviction is bolstered by the history of the defeat of the amendment which would have imposed a specific warrant requirement on the opening of international mails, *ante,* at 612 n. 8. The amendment was offered during the course of House debate on the Postal Reorganization and Salary Adjustment Act of 1970, Title 39 U. S. C., which created the United States Postal Service. This amendment was but one of more than 35 amendments to the Act offered on the floor of the House that day. 116 Cong. Rec. 20481 (1970). Speaking immediately before the amendment was defeated, Congressman Derwinski said:

"Going beyond the constitutional debate which we do not have the time for this afternoon, if this amendment were to be adopted, the problem of stopping the flow of narcotics and pornography would be greatly compounded.

"I do not believe we want to legislate on such a major issue with just 10 minutes of debate." *Id.,* at 20483.

Under such circumstances the defeat of this amendment cannot be considered an expression of the will of the House of Representatives on the

Second, the legislative history of the 1866 statute unambiguously discloses that this very concern was voiced during debate by Senator Howe, and that he was assured by the sponsor of the legislation that the bill would not authorize the examination of the United States mails. This colloquy is too plain to be misunderstood:

"Mr. HOWE. The second and third sections of this bill speak of the seizure, search, and examination of all trunks, packages, and envelopes. It seems to me that language is broad enough to cover the United States mails. I suppose it is not the purpose of the bill to authorize the examination of the United States mails.

"Mr. MORRILL [sponsor of the bill]. Of course not.

"Mr. HOWE. I propose to offer an amendment to prevent such a construction.

"Mr. EDMUNDS. There is no danger of such a construction being placed upon this language. It is the language usually employed in these bills.

"Mr. HOWE. If gentlemen are perfectly confident that it will bear no such construction, and will receive no such construction, I do not care to press it.

"The PRESIDING OFFICER. The Senator from Wisconsin withdraws his amendment." [3]

issue, but it does emphasize the reluctance of Congress to legislate in the area without careful consideration of the constitutional questions. See, e. g., 18 U. S. C. § 2510 (Omnibus Crime Control and Safe Streets Act of 1968) (warrant required to electronically intercept wire or oral communications); S. Rep. No. 1097, 90th Cong., 2d Sess., 66–76, 88–108, 161–177, 182–183, 187, 214–218, 224–226, 234–239 (1968). I do not, of course, imply that this incident is, in itself, sufficient to demonstrate congressional sensitivity to the individual interest in private communication. See ante, at 612 n. 8. I cannot believe, however, that the Court seriously questions the validity of my assumption that Congress (in 1866 as well as today) was indeed concerned about such matters.

[3] Cong. Globe, 39th Cong., 1st Sess., 2596 (1866). After consideration of one more amendment the bill passed the Senate the same day.

Third, the language of the statute itself, when read in its entirety, quite plainly has reference to packages of the kind normally used to import dutiable merchandise.[4]  It is true

----

[4] The first three sections of the Act, Further to Prevent Smuggling and for Other Purposes, enacted on July 18, 1866, read as follows:

*"Be it enacted by the Senate and House of Representatives of the United States of America in Congress assembled,* That, for the purposes of this act, the term 'vessel,' whenever hereinafter used, shall be held to include every description of water-craft, raft, vehicle, and contrivance used or capable of being used as a means or auxiliary of transportation on or by water; and the term 'vehicle,' whenever hereinafter used, shall be held to include every description of carriage, wagon, engine, car, sleigh, sled, sledge, hurdle, cart, and other artificial contrivance, used or capable of being used as a means or auxiliary of transportation on land.

"SEC. 2. *And be it further enacted,* That it shall be lawful for any officer of the customs, including inspectors and occasional inspectors, or of a revenue cutter, or authorized agent of the Treasury Department, or other person specially appointed for the purpose in writing by a collector, naval officer, or surveyor of the customs, to go on board of any vessel, as well without as within his district, and to inspect, search, and examine the same, and any person, trunk, or envelope on board, and to this end, to hail and stop such vessel if under way, and to use all necessary force to compel compliance; and if it shall appear that any breach or violation of the laws of the United States has been committed, whereby or in consequence of which, such vessel, or the goods, wares, and .merchandise, or any part thereof, on board of or imported by such vessel, is or are liable to forfeiture, to make seizure of the same, or either or any part thereof, and to arrest, or in case of escape, or any attempt to escape, to pursue and arrest any person engaged in such breach or violation: *Provided,* That the original appointment in writing of any person specially appointed as aforesaid shall be filed in the custom-house where such appointment is made.

"SEC. 3. *And be it further enacted,* That any of the officers or persons authorized by the second section of this act to board or search vessels may stop, search, and examine, as well without as within their respective districts, any vehicle, beast, or person on which or whom he or they shall suspect there are goods, wares, or merchandise which are subject to duty or shall have been introduced into the United States in any manner contrary to law, whether by the person in possession or charge, or by, in, or upon such vehicle or beast, or otherwise, and to search any trunk or

that buried deep in the first long sentence in § 3 of the Act to prevent smuggling there is an authorization to "search any trunk or envelope, wherever found." I do not believe, however, that the word "envelope" as there used was intended to refer to ordinary letters. Contemporary American diction-

envelope, wherever found, in which he may have a reasonable cause to suspect there are goods which were imported contrary to law; and if any such officer or other person so authorized as aforesaid shall find any goods, wares, or merchandise, on or about any such vehicle, beast, or person, or in any such trunk or envelope, which he shall have reasonable cause to believe are subject to duty, or to have been unlawfully introduced into the United States, whether by the person in possession or charge, or by, in, or upon such vehicle, beast, or otherwise, he shall seize and secure the same for trial; and every such vehicle and beast, or either, together with teams or other motive-power used in conveying, drawing, or propelling such vehicle, goods, wares, or merchandise, and all other appurtenances, including trunks, envelopes, covers, and all means of concealment, and all the equipage, trappings, and other appurtenances of such beast, team, or vehicle shall be subject to seizure and forfeiture; and if any person who may be driving or conducting, or in charge of any such carriage or vehicle or beast, or any person travelling, shall wilfully refuse to stop and allow search and examination to be made as herein provided, when required so to do by any authorized person, he or she shall, on conviction, be fined in any sum, in the discretion of the court convicting him or her, not exceeding one thousand dollars, nor less than fifty dollars; and the Secretary of the Treasury may from time to time prescribe regulations for the search of persons and baggage, and for the employment of female inspectors for the examination and search of persons of their own sex; and all persons coming into the United States from foreign countries shall be liable to detention and search by authorized officers or agents of the government, under such regulations as the Secretary of the Treasury shall from time to time prescribe: *Provided,* That no railway car or engine or other vehicle, or team used by any person or corporation, as common carriers in the transaction of their business as such common carriers shall be subject to forfeiture by force of the provisions of this act unless it shall appear that the owners, superintendent, or agent of the owner in charge thereof at the time of such unlawful importation or transportation thereon or thereby, was a consenting party, or privy to such illegal importation or transportation." 14 Stat. 178–179.

aries emphasize the usage of the word as descriptive of a package or wrapper as well as an ordinary letter.[5] This emphasis is consistent with the text of the bill as originally introduced, which used the phrase "any trunk, or other envelope."[6] Moreover, in 1866 when the Act was passed, there was no concern expressed in Congress about the smuggling of merchandise that would fit in a letter-size envelope.[7] A legislative decision to authorize the secret search of private mail would surely be expressed in plainer language than is found in the long statutory provision quoted in the margin; at the very least it would be supported by some affirmative evidence in the legislative history rather than the total disclaimer in the colloquy quoted above.

---

[5] "A wrapper; an outward covering or case." J. Worcester, A Dictionary of the English Language (1860).

"That which envelops, wraps up, encases, or surrounds; a wrapper; a cover; especially, the cover or wrapper of a document, as of a letter." N. Webster, An American Dictionary of the English Language (Goodrich & Porter eds. 1869).

These are the primary definitions given for "envelope."

[6] The word "other" was deleted by amendment, Cong. Globe, 39th Cong., 1st Sess., 2564 (1866). I recognize that one may argue that the deletion of the word "other" is evidence of an intent to include every kind of envelope rather than just those comparable to a "trunk." It seems more reasonable to infer, however, that the draftsmen considered the direct comparison to a trunk too restrictive and merely had in mind all containers which performed the same kind of packaging function even though not as large as a trunk. It seems unrealistic to interpret this change as intended to broaden the statute to encompass personal mail.

[7] The stated object of the 1866 Act was to prevent smuggling, especially from Canada along the North and Northwestern frontier:

"It has been found very difficult on our frontier during the last two years to prevent the system of smuggling which has been going on and increasing day by day. The custom-houses are defrauded and the Government is cheated." Remarks of Congressman Eliot, Cong. Globe, 39th Cong., 1st Sess., 3419 (1866).

See also remarks of Senator Morrill, id., at 2563; of Senator Williams, id., at 2567.

Fourth, the consistent construction of the statutory authorization by a series of changing administrations over a span of 105 years must be accorded great respect.[8]  *NLRB* v. *Bell Aerospace Co.,* 416 U. S. 267, 274–275; *Helvering* v. *Reynolds Co.,* 306 U. S. 110, 114–115.  If the Executive perceives that new conditions and problems justify enlargement of the authority that had been found adequate for over a century, then these matters should be brought to the attention of Congress. Cf. *H. K. Porter Co.* v. *NLRB,* 397 U. S. 99, 109.[9]

Finally, the asserted justification for the broad power claimed is so weak that it is difficult to believe that Congress would accept it without the most searching analysis.  The fear the new practice is intended to overcome is that the addressee of a suspicious item of mail would withhold consent to open foreign mail, thereby necessitating the return of the item to the sender.  But the refusal to accept delivery without disclosing the contents of a suspicious letter would itself be a fact which could be considered—along with whatever indicia caused the inspector to regard the item with suspicion in the first place—in a probable-cause determination.  There is no reason to believe that the alternatives of probable cause or consent would lead to the extensive return of contraband that

---

[8] An 1886 opinion of Acting Attorney General Jenks made reference to the practice followed in *Cotzhausen* v. *Nazro,* 107 U. S. 215, a case which involved the opening of package mail with the consent, and in the presence, of the addressee.  See 18 Op. Atty. Gen. 457, 458.  No opinion of any subsequent Attorney General has construed the statute any more broadly.

[9] In support of its argument in this Court that the 1971 regulations are reasonable within the meaning of the Fourth Amendment, the Government has assembled a plethora of statistical data obtained after the regulations were adopted.  Such a *post hoc* justification cannot, of course, inform us about the actual motivation for the adoption of the regulations.  I mention the point only because the Government's reliance on these data tends to confirm my judgment that if a new rule is to be fashioned, it should be drafted by the Congress.

would otherwise be confiscated on the basis of "reasonable cause to suspect."

If the Government is allowed to exercise the power it claims, the door will be open to the wholesale, secret examination of all incoming international letter mail. No notice would be necessary either before or after the search. Until Congress has made an unambiguous policy decision that such an unprecedented intrusion upon a vital method of personal communication is in the Nation's interest, this Court should not address the serious constitutional question it decides today. For it is settled that

> "when action taken by an inferior governmental agency was accomplished by procedures which raise serious constitutional questions, an initial inquiry will be made to determine whether or not 'the President or Congress, within their respective constitutional powers, specifically has decided that the imposed procedures are necessary and warranted and has authorized their use.' [*Greene* v. *McElroy*, 360 U. S. 474,] 507." *Hannah* v. *Larche*, 363 U. S. 420, 430.

Cf. *Ashwander* v. *Tennessee Valley Authority*, 297 U. S. 288, 347–348 (Brandeis, J., concurring). Accordingly, I would affirm the judgment of the Court of Appeals.