Gene LOCKS

v.

THREE UNIDENTIFIED CUSTOMS SERVICE AGENTS.

Gene LOCKS

v.

UNITED STATES of America.

Civ. Nos. 89–5822, 89–5823.

United States District Court,
E.D. Pennsylvania.

Oct. 31, 1990.

Kirk Wiedemer, Philadelphia, Pa., for plaintiff.

Bruce McKissock, Philadelphia, Pa., for British Airways.

David McComb, Philadelphia, Pa., for U.S. defendant and U.S. agents and officers.

## MEMORANDUM

LOUIS H. POLLAK, District Judge.

The gravamen of plaintiff's complaint is that on November 23, 1989, a sculpture that plaintiff shipped from London to Philadelphia via British Airways was irreparably damaged during a Customs inspection. Plaintiff subsequently filed two actions addressed to the alleged misfeasance of the Customs officials:[1] the first, civil action 89–5822, seeks damages from the Customs officials pursuant to *Bivens v. Six Unknown Federal Narcotics Agents*, 403 U.S. 388, 91 S.Ct. 1999, 29 L.Ed.2d 619 (1971). The second, civil action 89–5823, seeks damages directly from the United States under the Federal Torts Claim Act, ("FTCA"), 28 U.S.C. §§ 1346(b), 2671 *et seq.* Before me are (1) plaintiff's motion to reconsider my March 8, 1990 bench opinion announcing my intention to dismiss the complaint in civil action 89–5823[2]—the FTCA claim, and (2) defendants' motion for summary judgment in civil action 89–5822 —the *Bivens* action against the Customs

officials. For the reasons given below, plaintiff's motion to reconsider the FTCA claim will be denied, and defendant's summary judgment motion in the *Bivens* action will be granted.

### I. Facts

On January 21, 1989, plaintiff purchased a metal sculpture from a gallery in England. The sculpture can roughly be described as three metal pails that have been welded together in the shape of a cloverleaf and whose tops are sealed. The fair market value of the sculpture is alleged to be $20,900.00. There is substantial uncertainty whether the sculpture was purchased on behalf of the Marian Locks Gallery, located in Philadelphia, or for the plaintiff's own collection. The complaint alleges the former; plaintiff's deposition asserts the latter.

On January 22, plaintiff arranged to have the sculpture shipped on a British Airways flight leaving London on January 22 and arriving in Philadelphia on the same day. Plaintiff traveled to the United States on that same flight. To protect the sculpture during its passage, plaintiff placed the sculpture in a heavy wooden crate. On the outside of the crate plaintiff fixed his name, address and phone number, and also the name of the gallery.

The crated sculpture did not make it onto the flight. Following his discovery that the crate had not arrived with him in Philadelphia, plaintiff had a series of discussions with British Airways and Customs officials. The substance of those discussions is in some dispute. Plaintiff claims that he was advised by both the British Airways and Customs officials that lost baggage was a not infrequent occurrence and that the missing crate would likely arrive the next day. Plaintiff also claims that he was assured by both British Airways and Cus-

---

1. Plaintiff has filed a third action, civil action 90–3713, naming British Airways as a defendant.

2. I announced my decision to dismiss action 89–5823 at the conclusion of oral argument held March 8, 1990. At that same argument I ordered a period of limited discovery in order to determine if action 89–5822 should go forward. In order to avoid complications that could have

arisen had the plaintiff decided to appeal my decision in 89–5823 while the companion action was still pending in this court, I decided, without objection from counsel, to hold in abeyance the entry of a written order dismissing 89–5823. Thus, plaintiff's motion to reconsider is a request to reconsider the disposition that I announced my intent to pursue, but which has not yet been formally effected.

toms officials that he would be telephoned and asked to return to the airport to personally clear the crate through Customs when it arrived the next day. To that end, plaintiff claims to have provided the Customs officials with his phone number so that they could contact him.

After these discussions, plaintiff passed through Customs. He did not list the sculpture on his Customs declaration. Plaintiff claims that he informed a Customs official, Mr. Domenico, that he was missing a piece of luggage that contained a valuable piece of art and that he omitted the work from his declaration form on Mr. Domenico's specific instruction to declare only those items that were being cleared through Customs at that time. Mr. Domenico admits to having been informed of a missing bag, but denies he was told that it contained a work of art.

On January 23 the crate arrived on the same British Airways flight that plaintiff had taken the previous day. A British Airways official[3] presented the crate to Mr. Martin, a Customs official, for clearance through Customs. Martin gave the British Airways official some tools, suggested[4] that the crate be opened and left the British Airways official. Martin returned when the official had opened the crate. Martin visually inspected the crate's contents, noting that it "appeared to be three pails soldered together." (Martin deposition, at 17). He removed the pails, and noted that the pails seemed to be sealed on both the top and bottom, *id.*, and that they appeared to be "unusually heavy." *Id.* at 18. Based on this examination, but without any specific knowledge that would lead him to suspect criminal activity, Martin decided that the pails required further examination. To that end he delivered the work of art to Customs officers Eichmann and Abel in a room adjacent to the main Customs area.

Officers Eichmann and Abel proceeded to examine the object. The room they were in contained an x-ray machine but the machine was too small to fit the object. There was a larger x-ray machine located "down at the end of the hall," (DiCamillo deposition, at 70) and another located at the domestic terminal, either of which might have accommodated the object. However, no attempt was made to use either machine to examine the pails.

Upon confirming that the pails did "seem kind of bottom heavy" (Eichmann deposition, at 18), officers Eichmann and Abel decided that further examination was necessary and to that end drilled a small hole in the top and bottom of the pails. After inserting a probe, the officers concluded that the pails seemed to contain a "floater" —a wall—and as a result, proceeded to remove a portion of one of the buckets. Based on this, the officers concluded that the pails contained sand, dirt and pebbles that accounted for the unusual weight. They then returned the object to the main Customs area where the object was recrated and cleared to pass through Customs in the care of the British Airways official. Later that evening, plaintiff received the sculpture at his home and discovered the damage. At no time during the inspection had he been contacted by either British Airways or Customs officials.

## II. *The FTCA Claim*

The FTCA waives the United States' sovereign immunity for certain classes of claims. However, 28 U.S.C. § 2680(c) exempts from this waiver, "[a]ny claims arising in respect of ... the detention of any good or merchandise by any officer of customs." Plaintiff contends that an inspection of short duration, such as the one involved in the present action, is not a "detention" and thus is unaffected by this section that otherwise maintains the government's immunity. On the authority of *Kosak v. United States*, 465 U.S. 848, 104 S.Ct. 1519, 79 L.Ed.2d 860 (1984), I rejected this argument in my March 8, 1990 bench opinion and therefore announced my intention to grant the United States' Rule 12(b)(6) motion to dismiss the FTCA claim. Plaintiff's current motion for reconsideration substantially restates arguments that

---

**3.** The parties have been unable to identify the official in question.

**4.** The exact form of the conversation is unclear; Martin may have put the suggestion in the form of a request or in form of a directive.

I have previously rejected and thus I will deny plaintiff's motion for reconsideration.

### III. The Bivens Claim

Federal Rule of Civil Procedure 56(b) provides that summary judgment is appropriate if "there is no genuine issue as to any material fact and ... the moving party is entitled to a judgment as a matter of law." See also, *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248, 106 S.Ct. 2505, 2510, 91 L.Ed.2d 202 (1986). The party moving for summary judgment "bears the initial responsibility of informing the district court of the basis for its motion." *Celotex Corp. v. Catrett*, 477 U.S. 317, 323, 106 S.Ct. 2548, 2552, 91 L.Ed.2d 265 (1986). Summary judgment should be entered "against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case." *Id.* at 322, 106 S.Ct. at 2552.

■ *Bivens* and the cases following it make a damages action available to one who has suffered a constitutional tort at the hands of a federal official. Plaintiff's original complaint is somewhat obscure as it does not set out individual counts in the traditional manner; however, plaintiff alleges that the Customs agents' actions violated (1) the Fourth Amendment, (2) the Fifth Amendment, and (3) the Fourteenth Amendment. The last of these I dismissed at oral argument,[5] because that amendment applies only to the states, and the complaint identifies only federal and private actors. I now reaffirm that decision, leaving only the Fourth and Fifth Amendment claims for a more extended discussion.

### A. The Fourth Amendment Claim

Among the actions that may be complained of under *Bivens* are searches conducted in contravention of the Fourth Amendment. The first question we must face is whether, under any set of facts legitimately suggested through discovery, plaintiff might convince a fact-finder at trial that a Fourth Amendment violation occurred.

■ The Fourth Amendment prohibits only "unreasonable" searches. *Carroll v. United States*, 267 U.S. 132, 147, 45 S.Ct. 280, 283, 69 L.Ed. 543 (1925). As the Supreme Court has repeatedly made clear, the federal government's legitimate concerns for controlling its own borders make "reasonable" a broad expanse of searches conducted at the borders. See *United States v. Ramsey*, 431 U.S. 606, 616–19, 97 S.Ct. 1972, 1978–80, 52 L.Ed.2d 617 (1977) and cases cited therein; see also *United States v. Glasser*, 750 F.2d 1197, 1200–01 (3d Cir. 1984). In fact, in *Ramsey* the Court went so far as to announce that

> from before the adoption of the Fourth Amendment [border searches] have been considered to be "reasonable" by the single fact that the person or item in question had entered into our country from outside. There has never been any additional requirement that the reasonableness of a border search depended on the existence of probable cause. This longstanding recognition that searches at our borders without probable cause and without a warrant are nonetheless "reasonable" has a history as old as the Fourth Amendment itself. We reaffirm it now.

*Ramsey*, 431 U.S. at 619, 97 S.Ct. at 1980. This disposes of any contention that the search conducted by the Customs officers was unreasonable because the officers lacked a particularized suspicion that the pails might contain contraband or because the officers failed to get a warrant before conducting the search.

However, the Court in *Ramsey* also reserved the question of "whether, and under what circumstances, a border search might be deemed 'unreasonable' because of the particularly offensive manner in which it is carried out." *Id.* at 618, n. 13, 97 S.Ct. at 1979, n. 13 (citing *Kremen v. United States*, 353 U.S. 346, 77 S.Ct. 828, 1 L.Ed.2d 876 (1957) and *Go–Bart Importing Co. v. United States*, 282 U.S. 344, 356–58, 51 S.Ct. 153, 157–58, 75 L.Ed. 374 (1931)). Thus, this particular search might still run afoul of the Fourth Amendment if a fact-finder could conclude that the search was

---

**5.** Transcript of oral argument, March 8, 1990, at 20.

conducted in a "particularly offensive manner."

The cases referred to by the Court in *Ramsey—Kremen* and *Go-Bart*—were cases in which federal officers conducted wide-ranging and largely indiscriminate searches. In *Kremen* federal officers seized, and transported for two hundred miles, the full contents of a cabin. The list of items seized ran to eleven pages in the Supreme Court Reporter and seemed literally to include every item in the house, from toothpaste to frying pans to clothing items to a road map. 353 U.S. 349–59, 77 S.Ct. at 830–37. In *Go–Bart* the Court found unconstitutional a search by federal officers who falsely represented they had a warrant to search and who proceeded to seize a broad range of papers and through threat of force required the property's proprietor to open a safe for further examination. 282 U.S. at 349–50, 51 S.Ct. at 155.

In the present case, a number of facts produced through discovery might suggest to a fact-finder that alternative, and less damaging, means were available to effect the inspection of the art work. In particular, a fact-finder who credited plaintiff's testimony might conclude that the Customs officers could have contacted plaintiff to have him present at the time of the inspection. Plaintiff in turn might have requested an outside examination as is often done for the Philadelphia Museum of Art. (Di-Camillo deposition, at 70–71). The officers might also have attempted to use the x-ray equipment located down the hall. Sniffer dogs might have been brought to examine the pails.

In retrospect any of these courses might have sufficed to satisfy the Customs officials regarding the art work's legitimacy, and indeed, it might constitute simple negligence on the part of the Customs officers

to have acted as they did. However, simple negligence does not make out a Fourth Amendment violation. The case law covering border searches nowhere suggests an obligation on the part of Customs officials to conduct searches in the least intrusive manner available. Instead, as suggested in *Ramsey*, an official's obligation is to avoid conducting searches in a "particularly offensive manner." This search falls short of being "particularly offensive."

Officials testified that it is a common procedure to inspect left-over luggage presented to them by airline officials. (Di-Camillo deposition, at 84). They also testified that the practice of doing such inspections in the airport Customs area, as opposed to sending items to "cargo,"[6] was designed in part to help make items available more quickly to the owner and to help the owner avoid additional expense. (Martin deposition, at 44). The officials testified that the larger x-ray machine available nearby did not belong to Customs, was in operation only when there were outbound flights, and required Customs official to make extra arrangements for its use. *Id.* None of the officials suggested that the pails appeared to them to be a valuable work of art. Finally, the officials testified that drilling objects is a normal means of inspection and that in this case they used care to select the smallest drill suitable to their purpose. (Eichmann deposition, at 18). This testimony, all of which is uncontroverted by plaintiffs, establishes that while the incident is unfortunate, it was not the product of a "particularly offensive" manner of investigation. The search, while perhaps negligent, does not exhibit the indiscriminate seizure and overreaching present in *Kremen* and *Go–Bart*. Thus, defendants' border search was not "unreasonable" and therefore did not violate the Fourth Amendment.[7] In turn this dictates

---

**6.** "Cargo" is another customs area that is often used for items of apparent or declared high value and where a more careful and rigorous inspection can be done.

**7.** I wish to emphasize that this decision is one narrowly tailored to the facts in this particular

instance. I do not suggest that drilling unidentified objects is *per se* reasonable, or that Customs officials have virtually unbounded discretion to tear apart unusual objects. I hold only that, on the facts presented, the Customs officials cannot be said to have acted in a "particularly offensive" manner.

**1136**

that defendants' are entitled to summary judgment on plaintiff's Fourth Amendment complaint.[8]

### B. Fifth Amendment Claim

The Fifth Amendment prohibits deprivations of property accomplished "without due process of law." Accepting plaintiff's allegation that the work of art has been irreparably damaged, there does seem to have been a deprivation of property. The question, then, is whether this was accomplished without due process of law.

Plaintiff's submissions leave somewhat unclear his theory of recovery under the Fifth Amendment. The complaint, for example, simply recites the set of facts allegedly giving rise to the complaint and asserts that those facts demonstrate a violation of the "clear process for the exercise of authority and protection against abuse therefrom." Complaint, ¶ 15. Furthermore, plaintiff's response to defendants' summary judgment motion fails even to mention the Fifth Amendment or due process, arguing that "the issue before the court is whether or not there are material facts which dispute the reasonableness of the actions of the defendants." Plaintiff's Response, at 3. Nevertheless, in arguing that the Customs officials violated one of their own regulations in conducting the search, plaintiff might be thought to suggest a deprivation of property interests without the process guaranteed by the regulation. I turn now to that argument.

■ Plaintiff argues that the search conducted by the Customs officials is covered by 19 C.F.R. § 148.21(a). That regulation provides

> Customs officers shall not open baggage or other containers, nor unlock vehicles or compartments thereof for the purpose of examination, but shall detain them until the owner, his agent, or the person in charge of any baggage, container or vehicle opens or refuses to open them.

Plaintiff complains that inspection of the work of art in the room adjacent to the main Customs area—an inspection accomplished without the observation of the British Airways official—violated this regulation. However, the regulation requires only that customs officers shall not "open" baggage; it says nothing about any inspection subsequent to a bag being opened. On its face then, the complained of behavior does not violate the regulation.

Moreover, the uncontroverted testimony of the Customs officials is that baggage is often taken to a second room in which various tools are located and inspected out of sight of incoming passengers. The practice prevents a passenger from making a self-serving but dishonest denial of ownership upon seeing contraband removed from his bag, and limits security risks that might occur from passengers who decide to try and escape the Customs area upon seeing their baggage examined in detail. Thus, the uncontroverted testimony establishes that the Customs officials in this instance violated neither a regulation nor their own standard practice.

Under such facts, plaintiff's due process claim fails. As noted above, it does not appear that defendants violated any written or unwritten Customs policy. As noted in my discussion of the Fourth Amendment claim, defendants are at most guilty of negligence. Simple negligence, however, is as insufficient to support a due process claim as it is to support a claim of an illegal border search. See *Daniels v. Williams* 474 U.S. 327, 333, 106 S.Ct. 662, 666, 88 L.Ed.2d 662 (1986) (word "deprive" in the Fourteenth Amendment Due Process Clause connotes more than a negligent act); *Davidson v. Cannon*, 474 U.S. 344, 347, 106 S.Ct. 668, 670, 88 L.Ed.2d 677 (1986) (same). Accordingly, the Fifth Amendment claim must also be dismissed and summary judgment granted for defendants.[9]

---

**8.** This disposition makes it unnecessary to consider defendants' claim that, even if the search violated the Fourth Amendment, recovery under *Bivens* is barred by the defendants' qualified immunity.

**9.** This disposition makes it unnecessary to consider defendants' claim that, even if the search violated the Fifth Amendment, recovery under *Bivens* is barred by the defendants' qualified immunity.