**UNITED STATES, Appellee,**

v.

**Sergeant First Class Jersey M.A. WILLIAMSON, 261–96–1553, United States Army, Appellant.**

**ACMR 8702332.**

U.S. Army Court of Military Review

24 Feb. 1989.

512

For Appellant: Lieutenant Colonel Russell S. Estey, JAGC, Major Eric T. Franzen, JAGC, Captain Keith W. Sickendick, JAGC (on brief).

For Appellee: Colonel Norman G. Cooper, JAGC, Lieutenant Colonel Gary F. Roberson, JAGC, Major Gary L. Hausken, JAGC (on brief).

Before DeFORD, KENNETT, and WERNER, Appellate Military Judges.

## OPINION OF THE COURT

DeFORD, Senior Judge:

Contrary to her pleas, the appellant was convicted by a general court-martial of one specification of possession of marijuana and one specification of use of cocaine in violation of Article 112a of the Uniform

Code of Military Justice, 10 U.S.C. § 912a (Supp.). She was sentenced to a dishonorable discharge, forfeiture of all pay and allowances, and reduction to the grade of Private E1. The convening authority approved only so much of the sentence as provided for dishonorable discharge, forfeiture of $438.00 pay per month for 51 months and reduction to the grade of Private E1.

On appeal, the appellant alleges among other matters that the military judge erred by failing to suppress evidence of cocaine and marijuana resulting from an illegal seizure. We disagree and affirm appellant's conviction and sentence.

## I

### Statement of Facts

The appellant and her husband, both soldiers, were transferred pursuant to normal permanent-change-of-station orders from Redstone Arsenal, Alabama, to the Federal Republic of Germany. On 8 and 9 December 1986, the appellant's household goods were shipped to Heilbronn, Germany, and placed unopened in storage for administrative reasons unrelated to this case. On 2 May 1987, the appellant was ordered to return to Redstone Arsenal, Alabama, to face pending charges of narcotics violations.[1] Her household goods remained unopened in Heilbronn, Germany, pending reshipment to Redstone Arsenal.

The Army Transportation Office in Germany notified the military police customs inspectors that the appellant's shipment was being returned to the United States and that the appellant had been "apprehended" for drug abuse. With this information, the military customs office determined that the shipment was one of "high risk" which would require a thorough customs examination. The military police customs officials had no knowledge of incriminating information other than the appellant's alleged drug abuse which had

been identified through urinalysis. On 11 June 1987, military police customs inspectors conducted a warrantless "examination" of the appellant's shipment of the stored household goods in Heilbronn, Germany. The inspectors broke the bands which sealed the crates, removed each item piece by piece, and thoroughly examined the contents of the shipment. In the course of their "examination," the inspectors discovered two hand-rolled cigarette butts contained in a purse belonging to the appellant and a bottle containing the residue of a white powder concealed within a Coca–Cola can. The cigarette butts later tested positive for marijuana; the whitish powder contained in the bottle tested positive for cocaine.[2]

At trial, the appellant moved to suppress this evidence as illegally obtained in violation of Military Rule of Evidence 311. Specifically, the appellant contended that the "examination" was not a "border search" within the meaning of Manual for Courts–Martial, United States, 1984, Military Rule of Evidence 314(b).

The military judge admitted the evidence of the seized contraband finding that the appellant's household goods were destined for shipment to the United States from Germany; that the household goods were located physically within the Federal Republic of Germany; that the Transportation officials had notified military police customs officials that the appellant was being returned to the United States for "alleged drug involvement"; that the household goods were examined without benefit of a search authorization or warrant; that the examination was a lawful customs examination; and that, consequently, authorization or warrant to search was not required.

## II

On appeal, as we have noted, the appellant alleges that the government agents illegally seized and searched her household

---

1. The appellant had taken a urinalysis test prior to departure which subsequently tested positive for cocaine.

2. In addition to the illegal substances seized, the inspectors seized more than forty other items of government and personal property which were improperly packed and shipped in violation of applicable regulations.

goods and that the evidence of the contraband substances should have been suppressed. The government contends that the examination conducted in the case at bar is a lawful customs search within the "border search" exception to the warrant requirement of the Fourth Amendment. *See United States v. Ramsey*, 431 U.S. 606, 97 S.Ct. 1972, 52 L.Ed.2d 617 (1977) (border searches without warrant and without probable cause are nonetheless "reasonable" within the search requirement of the Fourth Amendment). *See also United States v. 12 200–Ft. Reels of Film*, 413 U.S. 123, 93 S.Ct. 2665, 37 L.Ed.2d 500 (1973) (international border searches are governed by different rules than domestic searches).

■ The border search exception is not premised on exigent circumstances as are other exceptions to the constitutional requirement for a warrant. *United States v. Ramsey*, 431 U.S. at 621, 97 S.Ct. at 1981 (1977). Rather, this exception for border searches is premised upon the "longstanding right of the sovereign to protect itself by stopping and examining persons and property crossing into this country." *United States v. Ramsey*, 431 U.S. at 616, 97 S.Ct. at 1978. *See Carroll v. United States*, 267 U.S. 132, 153–54, 45 S.Ct. 280, 285, 69 L.Ed. 543 (1925) ("Travelers may be so stopped in crossing an international boundary because of national self protection [sic] reasonably requiring one entering the country to identify himself as entitled to come in, and his belongings as effects which may be lawfully brought in"). Thus, a customs official may conduct routine searches at the international border without a warrant or probable cause or even "reasonable suspicion". *United States v. Montoya de Hernandez*, 473 U.S. 531, 538, 105 S.Ct. 3304, 3309, 87 L.Ed.2d 381 (1985) (citing *United States v. Ramsey*, 431 U.S. at 616–19, 97 S.Ct. at 1978–80; *Almeida–Sanchez v. United States*, 413 U.S. 266, 272–73, 93 S.Ct. 2535, 2539–40, 37 L.Ed.2d 596 (1973); and *Carroll v. United States*, 267 U.S. at 154, 45 S.Ct. at 285).

■ In order to qualify for the border search exception to the warrant requirement of the Fourth Amendment, the search must take place at a border of the United States or its "functional equivalent." *Almeida–Sanchez v. United States*, 413 U.S. at 272, 93 S.Ct. at 2539. The "border" must be international in character. *Torres v. Puerto Rico*, 442 U.S. 465, 99 S.Ct. 2425, 61 L.Ed.2d 1 (1979). When the search occurs *at* an international border the search is reasonable because the item or person is *entering* the country. *United States v. Troise*, 796 F.2d 310, 313 (9th Cir.1986). The sovereign's right to control access thus adheres at the international border. Similarly, border searches may be conducted in conformance with the exception when they are conducted at "functional equivalents to an international border" and the person or item has "just crossed" the international border. *See, e.g., United States v. Mayer*, 818 F.2d 725 (10th Cir.1987); *United States v. Delgado*, 810 F.2d 480 (5th Cir.1987). The Supreme Court in *Almeida–Sanchez* provided two examples of what may be considered the functional equivalent of a border. First, a search occurring at "an established station near the border, at a point marking the confluence of two or more roads that extend from the border" occurs at the functional equivalent of an international border. *Almeida–Sanchez v. United States*, 413 U.S. at 273, 93 S.Ct. at 2539. Second, a search of a non-stop international flight upon arrival at an airport within the United States likewise occurs at the functional equivalent of an international border. *Id. See, e.g., United States v. Montoya de Hernandez*, 473 U.S. 531, 105 S.Ct. 3304, 87 L.Ed.2d 381 (1984) (customs detention at Los Angeles International Airport on arrival from a direct 10–hour flight from Bogota, Columbia). Thus, it is the locus of the search which determines whether the search qualifies for the border search exception.

Beyond coining the phrase "functional equivalent of a border" and providing two examples, the Supreme Court has not explained, defined or otherwise elaborated upon the meaning of this term. The Federal courts have held, however, that in order to qualify a search as occurring at the functional equivalent of a border, a border must be crossed. *United States v. Garcia,*

672 F.2d 1349, 1365 (11th Cir.1982). *See also United States v. Mayer*, 818 F.2d 725 (10th Cir.1987), and *United States v. Delgado*, 810 F.2d 480 (5th Cir.1987). In the usual circumstance, for this exception to apply, the traditional customs search must be conducted at or near the "physical boundary" or the functional equivalent of the "physical boundary." *United States v. Caminos*, 770 F.2d 361 (3d Cir.1985).

■ The Military Rules of Evidence authorize the admission of evidence of a border search without probable cause—and perforce without warrant—"for customs or immigration purposes ... *when authorized by Act of Congress.*" Manual for Courts–Martial, United States, 1984, Military Rule of Evidence 314(b) [hereinafter Mil.R.Evid.] (emphasis supplied). Congress has prescribed the limits of such searches and the persons who may conduct customs "inspections." No act of Congress purports to authorize any type of customs search beyond a circumscribed "customs-enforcement area." [3] Nor does any regulation by the Department of the Treasury promulgated pursuant to the Congressional authorization granted by 19 U.S.C. § 1582 purport to authorize an extraterritorial customs search of the character of that conducted in the case at bar.[4] Treasury regulations specifically provide that baggage on carriers operated by the Department of Defense (DoD) "shall be examined at the port where landed in the same manner as baggage on commercial vessels." 19 C.F.R. § 148.73. The record of trial in the case before us does not establish the exact nature of the locus of the inspection. Whether it was a regular location for the inspection of DoD cargo is unclear. Certainly it appears that it was not on any base or other area regularly used by the United States Armed Forces but rather in a commercial warehouse in which space had been leased by the United States government for DoD cargo storage. Accordingly, because of the lack of factual certainty, we decline to apply the border search doctrine as set forth in Mil.R.Evid. 314(b) and as defined in judicial precedent to the warrantless customs examination conducted at a warehouse in Heilbronn, Germany, a locus within the sovereign territory of the Federal Republic of Germany and more than 4,000 miles from any physical boundary of the United States.

### III

At trial, however, the government argued that the search was a lawful customs examination conducted in accordance with Department of Defense Regulation 5030.-49–R, Customs Inspection (27 May 1977) [hereinafter DoD Reg. 5030.49–R]. Although this regulation has no legal effect with respect to the admissibility of evidence, we nevertheless agree with the military judge's ruling that, under the circumstances of this case, the search by the military police customs inspectors was a lawful, warrantless search.

We first note that the "inspection" conducted in the case at bar was not a "military inspection" as that term is defined by law to date. In military law, the courts have traditionally distinguished between military inspections and searches. *See United States v. Ellis*, 24 M.J. 370 (C.M.A. 1987). *Compare* Mil.R.Evid. 313 *with* Mil. R.Evid. 314 and 315. Military inspections have continued to be those inspections "ordered for the purpose of insuring sanitation and cleanliness, security, military fitness, or good order and discipline." *United ed States v. Ellis*, 24 M.J. at 372. *See also*

---

**3.** *See* 19 U.S.C. §§ 1461 (inspection of merchandise and baggage "at the first port of entry"), 1467 (inspection of persons, merchandise, and baggage discharged or unladen from vessels arriving from a foreign port in the United States via another port in the United States), 1496 (inspection of baggage "arriving in the United States"), 1581 (boarding of vessels "at any place in the United States or within the customs waters" of the United States), 1582 (detention and search of baggage and persons "coming into the United States"), and 1587 (examination of "hovering" vessels within the "customs waters" or the "customs-enforcement area").

**4.** Treasury regulations generally provide that: All persons, baggage, and merchandise *arriving in the Customs territory of the United States* from places outside thereof are liable to inspection and search by a Customs officer. 19 C.F.R. § 162.6 [emphasis supplied].

Mil.R.Evid. 313(b) ("An 'inspection' is an examination ... conducted as an incident of command the primary purpose of which is to determine and to ensure the security, military fitness, or good order and discipline of the unit, organization, installation, vessel, aircraft, or vehicle"). Consequently, the intrusion by the military police customs inspectors in the case at bar was not a classic military inspection but a customs inspection/search. The agents who conducted the inspections had no reasonable suspicion that the appellant's shipment of household goods contained contraband; consequently, the search could not qualify as a probable cause search under Mil.R. Evid. 315. Therefore, the sole remaining basis for admissibility of the evidence in issue would, of necessity, be determined by Mil.R.Evid. 314(k).

Mil.R.Evid. 314(k) provides:

A search of a type not otherwise included in this rule and not requiring probable cause under Mil.R.Evid. 315 may be conducted when permissible under the Constitution of the United States as applied to the members of the armed forces.[5]

In *Griffin v. Wisconsin,* the United States Supreme Court ruled that the warrantless search of a probationer's home pursuant to the rules and regulations of the Wisconsin State Department of Health and Social Services satisfied the demands of the Fourth Amendment because the search was "carried out pursuant to a regulation that itself satisfies the Fourth Amendment's reasonableness requirement under well established principles." *Griffin v. Wisconsin,* 483 U.S. 868, 107 S.Ct. 3164, 3167, 97 L.Ed.2d 709 (1987). In affirming Griffin's conviction for possession of a firearm by a convicted felon, the Supreme Court refused to suppress the evidence seized during a warrantless search of the Griffin's home stating:

Although we usually require that a search be undertaken only pursuant to a warrant (and thus supported by probable cause, as the Constitution says warrants

must be), *see, e.g., Payton v. New York,* 445 U.S. 573, 586, 100 S.Ct. 1371, 1380, 63 L.Ed.2d 639 (1980), we have permitted exceptions when "special needs, beyond the normal need for law enforcement, make the warrant and probable-cause requirement impracticable." *New Jersey v. T.L.O.,* 469 U.S. 325, 105 S.Ct. 733, 749, 83 L.Ed.2d 720 (1985).

*Griffin v. Wisconsin,* 107 S.Ct. at 3167. The Court concluded that "it [is] clear that the special needs of Wisconsin's probation system make the warrant requirement impracticable and justify replacement of the standard of probable cause by 'reasonable cause.'" *Id.* at 3169.

■ In *New York v. Burger,* the United States Supreme Court ruled that warrantless administrative inspections of closely regulated commercial enterprises will be deemed reasonable for Fourth Amendment purposes whenever a substantial governmental interest necessitates a warrantless inspection and the regulatory scheme provides an adequate substitute for a warrant. *New York v. Burger,* 482 U.S. 691, 107 S.Ct. 2636, 2643–44, 96 L.Ed.2d 601 (1987). A warrantless inspection will be deemed to be reasonable so long as three criteria are met: first, there must be a substantial government interest which supports the existence of the warrantless regulatory inspection; second, the warrantless inspection must be necessary to effectuate the government interest; finally, the scheme of inspection must provide a "constitutionally adequate substitute for a warrant." *Id.* 107 S.Ct. at 2644.

■ Department of Defense Regulation (DoD) 5030.49R establishes a regulatory customs inspection system for the Armed Forces of the United States in areas outside the customs inspection territory of the United States occupied by the Armed Forces, under the general supervision and/or advice of the United States .Custom

---

**5.** The analysis of the Military Rules of Evidence provides little assistance as it states: Other searches, Rule 314(k) recognizes that searches of a type not specified within the Rule but

proper under the Constitution are also lawful. Manual for Courts Martial, United States, 1984, Analysis of Military Rule of Evidence 314(k), App. 22, A22–26.

Service.[6]

The policy upon which the regulation is based is set forth in paragraph 1002 and provides that the regulation is designed to (a) eliminate the flow of narcotics, drugs and other contraband into the United States through all DoD channels, including the defense transportation system and military postal channels; (b) cooperate fully with and assist all other government agencies in enforcing the laws and regulations of the United States concerning customs, agricultural, and immigration border clearances; (c) minimize inconvenience to DoD personnel and delays in movement of DoD cargo and mail caused by the enforcement of United States border clearance regulations. To this end, the regulation requires that *"all DoD sponsored cargo* [destined for the United States] *will be inspected or examined as appropriate, within the overseas area, preferably at the point of origin prior to shipment of the cargo to the CTUS* [Customs Territory of the United States]". DoD Reg. 5030, 49–R, para. 5004 (emphasis added).

The customs inspection system created by the DoD regulation therefore creates a pre-customs inspection which aids the United States Custom Service in enforcing the custom laws of the United States, assists in eliminating the potential for contraband to enter the custom territory of the United States, enhances the rapid ingress and egress of DoD cargoes through the border and generally protects the Armed Forces from narcotics and other contraband. The foregoing policy considerations are essentially identical with the border search doctrine, *i.e.*, the sovereign's right to protect itself from persons and property crossing its borders.

We further note that Article XIII of the Status of Forces Agreement of the North Atlantic Treaty, T.I.A.S. 2846, places an independent duty upon the United States to insure that prohibited substances products and other illegal materials are not brought into NATO countries by United States forces.[7] The foregoing treaty provision establishes the singular legal duty on the part of the sending state (in this instance, the United States) to take all reasonable measures within its power to insure drugs, narcotics, and other contraband as defined by the receiving state and which are liable to seizure, are handed over to those authorities. By so acting, the sending state insures that those contraband items do not enter the receiving state as well as preclude the access of those same items to its own force.

Although we are not here concerned with participation of the German authorities, we are required to consider the legal duty which impacts on the United States' customs responsibility in Germany.

Applying the foregoing considerations in light of the criteria set forth in *New York v. Burger*, we find insofar as the first factor is concerned that there can be little doubt that the governmental interest in securing the international borders of the United States against illicit narcotics is a substantial governmental interest. *See generally United States v. Ramsey, supra.* Furthermore, the Department of Defense has a substantial interest in facilitat-

---

**6.** See paragraphs 2001n, 3009 and 5002g of DoD Regulation 5030.49–R.

**7.** The Status of Forces Agreement of the North Atlantic Treaty, T.I.A.S. 2846, was signed by executive branch of the United States Government on 19 June 1951 and was ratified by the United States Senate with statement on 15 July 1953 and entered into force on 23 August 1953. As a ratified Treaty it has the force and effect of Federal law. *See Egle v. Egle,* 715 F.2d. 999 (5th Cir.1983), writ denied, *In re Egle,* 469 U.S. 1032, 105 S.Ct. 549, 83 L.Ed.2d 437, mandamus denied, *In re Egle,* 469 U.S. 1206, 105 S.Ct. 1234, 84 L.Ed.2d 371 (1985); *Vorhees v. Fischer and Krecke,* 697 F.2d. 574 (4th Cir.1983).

Article XIII of the Status of Forces Agreement of the North Atlantic Treaty, T.I.A.S. 2846, provides as follows:

    1. In order to prevent offences against customs and fiscal laws and regulations, the authorities of the receiving and of the sending States shall assist each other in the conduct of inquiries and the collection of evidence.

    2. The authorities of a force shall render all assistance within their power to ensure that articles liable to seizure by, or on behalf of, the customs or fiscal authorities of the receiving State are handed to those authorities.

ing customs clearance for the substantial numbers of myriad cargoes which it must move across international borders in order to accomplish its global missions and commitments. Finally, the preclearance procedure for household goods set forth in the regulation is a substantial interest insofar as it permits service members who are changing duty stations to do so with a minimum of inconvenience and delay. Thus, the governmental interests involved in this regulatory scheme are even more compelling than those identified in *Burger* because they are not solely related to crime prevention as were the interests identified in *Burger. See New York v. Burger,* 107 S.Ct. at 2647.

Nor can there be any serious question that warrantless inspections are a necessary means to further the general statutory and regulatory schemes of the United States and its instrumentalities which control access across its international borders as well as those of its allies. Preclearance inspections deter and detect the shipment of a broad spectrum of prohibited and restricted items as well as illegal contraband. *Cf. New York v. Burger,* 107 S.Ct. at 2647. The regulation prohibits or restricts the shipment of a comprehensive list of items including flammable products, lottery tickets, "obscene and immoral articles," firearms, ammunition, prescription drugs, tobacco products, liquor and alcoholic beverages, and a wide variety of agricultural items, to name a few of the prohibited items. In the case at bar, the military customs inspectors seized more than forty items unlawfully included within the appellant's household goods shipment in addition to the illicit substances. From the non-contraband items seized in the case at bar, one may readily perceive that the government "rationally may believe" that regulatory inspections of international shipments of household goods would curtail the inclusion of prohibited and restricted items from international shipments as well as illicit contraband. *Id.* at 2647. A warrant requirement would not only hamper the efforts of the government to regulate the movement of cargoes across international borders, but would impede its compliance with treaty

commitments as well as wholly frustrate the government's interests in regulating such commerce by requiring a prerequisite showing of probable cause before permitting inspection. *Cf. Griffin v. Wisconsin,* 107 S.Ct. at 3169.

Finally, the regulation provides a "constitutionally adequate substitute for a warrant." *New York v. Burger,* 107 S.Ct. at 2648 (quoting *Donovan v. Dewey,* 452 U.S. 594, 603, 101 S.Ct. 2534, 2540, 69 L.Ed.2d 262 (1981)). "What is reasonable [for purposes of the Fourth Amendment] depends upon all of the circumstances surrounding the search or seizure itself." *United States v. Montoya De Hernandez,* 473 U.S. at 537, 105 S.Ct. at 3308 (citing *New Jersey v. T.L.O.,* 469 U.S. 325, 337–342, 105 S.Ct. 733, 740–43, 83 L.Ed.2d 720 (1985)). To determine reasonableness, a court must balance "the need to search against the invasion which the search entails." *New Jersey v. T.L.O.,* 469 U.S. at 337, 105 S.Ct. at 740. In *Burger,* the Supreme Court found that the administrative inspection provided for by regulation was an adequate substitute for a warrant because it "informed" the operator of the commercial enterprise that inspections would be made and because the authority to inspect was limited by time, place and scope. *New York v. Burger,* 107 S.Ct. at 2648 (citing *Donovan v. Dewey,* 452 U.S. 594, 605, 101 S.Ct. 2534, 2541, 69 L.Ed.2d 262 (1981), *United States v. Biswell,* 406 U.S. 311, 315, 92 S.Ct. 1593, 1596, 32 L.Ed.2d 87 (1972)).

In the case at bar, we find, as did the court in *Burger,* that the appellant's privacy interest in the shipment was highly attenuated. *See New York v. Burger,* 107 S.Ct. at 2643. *See also United States v. Ayala,* 22 M.J. 777, 784 n. 14 (A.C.M.R. 1986), *affirmed,* 26 M.J. 190 (C.M.A.1988). The appellant, a servicewoman with over twelve years of service, had experienced foreign service in the past to include two prior tours in Germany. She well knew that her household goods would be shipped across international borders and would be subject to customs inspections as an incident to this movement. Moreover, the appellant had delivered the goods into the

custody of the Department of Defense. Consequently, the appellant had at best only "the most minimal expectation" of privacy in the crated goods. *United States v. Muniz*, 23 M.J. 201, 206 (A.C.M.R.1987). The regulation further informed the appellant that a preclearance inspection would be conducted on her DoD sponsored cargo "within the overseas area, preferably at the point of origin, prior to shipment" to the continental United States. DoD Reg. 5030.49–R, para. 5004. The regulation advised the appellant of the agents responsible for conducting the inspection and set forth the nature of the items that the inspection would focus on. DoD Reg. 5030.-49–R, paras. 8005 and 8007. The appellant was thus well aware of the items which were not permitted. Further, the regulation limited the authority of the inspectors to those shipments destined for the continental United States at Government expense or under Government sponsorship as identified by permanent change of station orders. DoD Reg. 5030.49–R, paras. 8001 and 8004(b). The scope of their inspection was limited to those items identified by the regulation as prohibited or restricted "at a time such that the owner of will not have access to the shipment prior to its shipment to the United States." DoD Reg. 5030.49–R, para. 8008. These provisions of the regulation provide a constitutionally adequate substitute for a warrant on par with the regulatory provision considered by the Supreme Court. in *Burger*.

Balancing the invasion of appellant's attenuated privacy interest against the compelling interests of the government, we find that the inspection and/or search conducted in the case at bar was not unreasonable within the context of the Fourth Amendment as defined in *Burger* and *Griffin*. Accordingly, the military judge did not err in failing to suppress the evidence of cocaine and marijuana seized from appellant's shipment. The evidence was admissible under Mil.R.Evid. 314(k) as a warrantless search not specified within the rule but proper under the Constitution.

## IV

◼ Appellant through counsel further alleges that the staff judge advocate erred in failing to reply to the legal issues raised by the appellant in her post-trial submission under R.C.M. 1105–1106. The staff judge advocate's post-trial review was dated 29 February 1988, and, although the record does not disclose the exact date it was served upon the trial defense counsel, we can safely assume it was served shortly after that date as the trial defense counsel responded on 2 March 1988. There he set forth seven allegations of legal error he believed were committed during the pretrial processing or trial of appellant's case. Although the staff judge advocate filed an addendum to his post-trial review, he did not comment on any of the alleged so-called errors.

Government appellate counsel agree that the staff judge advocate erred but contend the error was harmless. They further point out that six of the errors alleged by trial defense counsel were the subject of motions before the trial court that were decided adversely to the appellant at trial. Our examination of these errors does not indicate any prejudicial error. Under the rationale of *United States v. Hill*, 27 M.J. 293, 296–297 (C.M.A.1988), we find and hold that the so-called allegations of error set forth by the trial defense counsel in his R.C.M. 1105–1106 response would not, in any sense, have resulted in a favorable recommendation by the staff judge advocate or a favorable action for the appellant by the convening authority. Consequently, we find the staff judge advocate's error in failing to comment thereon, was, in this instance, harmless. *United States v. Hill* 27 M.J. at 296–297.

## V

The court has also examined the personal allegations of the appellant as noted, and insofar as they are not included in the assignments of error of appellate defense counsel, they are deemed to be without merit or constitute harmless errors.

Finally, the allegations of error raised by appellant through appellate defense counsel not specifically discussed in parts I

**520**

through III above are deemed to constitute error; however, we find no prejudice to this appellant. Accordingly, the errors were harmless. *See* Article 59, UCMJ, 10 U.S.C. § 859.

Accordingly, the findings of guilty and the sentence are affirmed.

Judge KENNETT concurs.

WERNER, Judge, concurring:

The majority opinion correctly applies the Supreme Court analysis of *New York v. Burger* and finds a constitutionally permissible exception to the warrant requirement of the Fourth Amendment. This exception was, however, previously recognized by this court in *United States v. Greene,* 44 C.M.R. 420 (A.C.M.R), *petition denied,* 44 C.M.R. 939 (C.M.A.1971), and acknowledged by the United States Court of Military Appeals in *United States v. Carson,* 46 C.M.R. 203 (C.M.A.1973), and *United States v. Hamilton,* 46 C.M.R. 209. In *Carson* and *Hamilton,* the exception was referred to as a "customs-like warrantless search." The correct application of the *Burger* analysis in the case at bar reaffirms the viability of this military exception to the warrant requirement of the Fourth Amendment.