**UNITED STATES of America**

v.

**Fatima MAZUERA and Fabio Arias.**

**No. 90–6181–CR–PAINE.**

United States District Court,
S.D. Florida.

Jan. 31, 1991.

Richard Hine, Asst. U.S. Atty., for U.S.

Robin Farnsworth, Plantation, Fla., for Fatima Mazuera.

Michael Hursey, Fort Lauderdale, for Fabio Arias.

## ORDER ON MOTIONS TO SUPPRESS

PAINE, District Judge.

Before the court is the Defendants', FATIMA MAZUERA ("MAZUERA") and FABIO ARIAS ("ARIAS"), Motions to Suppress. After a hearing was held in this matter on January 29, 1991, and after reviewing the record, the memoranda of counsel and the law, the court enters the following order for the reasons set forth hereinafter.

## BACKGROUND

The Defendants in this action have been charged with knowingly and willfully receiving three counterfeit hundred dollar bills in violation of 18 U.S.C. § 473. In accordance with *Jackson v. Denno,* 378 U.S. 368, 84 S.Ct. 1774, 12 L.Ed.2d 908 (1964), an evidentiary hearing was held on January 29, 1991, in order to determine the merits of suppression Motions filed by each of the Defendants.

In light of the testimony presented on that occasion, the court finds that three unresolved issues remain before it. These are: (1) Whether the Government made a warrantless entry into the Defendants' apartment without their consent; (2) Did the Defendants make a voluntary, knowing and intelligent waiver of their *Miranda* rights; and (3) Was the Government given permission by the Defendants to conduct a search their apartment.[1] It is from this juncture that the court will consider the testimony of the witnesses, as well as the record before it, in determining whether to grant the Defendants' Motions.

## MOTIONS TO SUPPRESS

It is uncontested by the parties that on August 27, 1990, during the routine inspection of a letter mailed from Cali, Colombia, United States Custom Agents discovered three counterfeit $100 bills. The letter in question was addressed to a "Senora Fatima Mazuera" in Margate, Florida. Shortly thereafter, on August 30, 1990, United States Secret Service Agents and Postal Inspectors attached a postal beeper [2] to the envelope and made a controlled delivery of the letter to the address. At that time MAZUERA accepted the letter, signed a delivery receipt for it and returned inside. Shortly thereafter, Government agents detected the signal from the postal beeper. It is at this point that the Plaintiff's and the Defendants' recollections as to what subsequently occurred differ greatly.

## THE GOVERNMENT'S VERSION OF EVENTS

At the suppression hearing held on January 29, 1991, the Government proffered the testimony of two witnesses as to its version of the events of August 30, 1990. They were: Frank Donzanti ("Donzanti"), a Special Agent with the Secret Service for eleven and a half years, and Eric Cordero ("Cordero"), a Postal Inspector with the United States Postal Service for nine years. According to Donzanti and Cordero, they knocked on the door of the apartment shortly after the postal beeper went off. Accompanying them were five other agents. Although they were armed, their weapons were not drawn or noticeable. When MAZUERA answered the door, Donzanti identified himself and asked the Defendant if he and the agents could come inside to talk. MAZUERA responded in English that they could and the agents entered making a protective sweep of the apartment in order to insure their safety.

Present in the apartment at that time was the co-Defendant, FABIO ARIAS, their child[3], along with two other adults and a small child. Donzanti testified that MAZUERA held in her hand what seemed to be the envelope which had contained the postal beeper and that when questioned about the money, the Defendant denied knowing anything. He stated that he next proceeded to read MAZUERA her *Miranda* rights in English. According to the agent, the Defendant stated that she understood her rights and that she would talk to him. She did not request that an attorney be present and continued to deny the existence of the counterfeit bills. Thereafter, Donzanti next asked MAZUERA if the agents could conduct a search of the apartment and told her that it was okay for her

---

1. It should be noted for the record that both sides concede that international mail may be opened in order to look for contraband under the border search exception. *United States v. Ramsey,* 431 U.S. 606, 97 S.Ct. 1972, 52 L.Ed.2d 617 (1977).

2. According to the Government witnesses, a postal beeper is activated, i.e. emits a signal on a specified frequency which can be detected from a distance, when the envelope to which it is attached is opened.

3. ARIAS is MAZUERA's common-law husband.

to refuse. The agent testified that the Defendant replied "go ahead" and that a subsequent search led to the discovery of the envelope as well as carbon paper which had been contained in the envelope. The postal beeper was located on the kitchen table.

The testimony also revealed that ARIAS was taken by Inspector Cordero into another room where he was informed of his *Miranda* rights in Spanish. According to Cordero, the Defendant stated that he understood his rights and that he would talk to him. When the agents asked ARIAS if he could produce some identification, the Defendant removed his wallet. The agents then asked if they could look in his wallet and ARIAS handed it over stating "what you are looking for is inside." The three bills were discovered in the billfold and ARIAS then admitted that his wife gave them to him and that they were going to use them to buy a sewing machine. He further admitted that he had received counterfeit money from Colombia on one prior occasion and that they had used the bills at that time to buy medicine for their child.

The witnesses stated that approximately forty-five minutes after first entering the Defendants' apartment, the agents left and MAZUERA was asked at this time if she would go along with them to their office in Fort Lauderdale, Florida in order to give a written statement. Agent Donzanti testified that she consented and was followed to the Secret Service office by ARIAS and their child in the family's automobile. On the way there MAZUERA was questioned in Spanish by Inspector Cordero. According to the Donzanti and Cordero, the Defendant corroborated ARIAS' testimony concerning the use of the money to buy a sewing machine and gave the agents some details concerning the origin of the bills. Upon arriving in Fort Lauderdale, both Defendants were read their rights in Spanish, gave written statements, were fingerprinted and photographed. They were subsequently released and allowed to return home. In addition, the Government's witnesses stated that at no time during the course of events were the Defendants ever threatened or restrained.

## THE DEFENDANTS' VERSION OF EVENTS

The testimony of the two Defendants was offered as to the defenses' version of the events occurring on August 30, 1990. According to MAZUERA, there was knock on the door following the controlled delivery of the letter. When she opened the door, the agents, without permission, entered the apartment. She testified that Agent Donzanti kept asking her "where are they, where are they" in reference to the counterfeit bills and that she continually denied any knowledge of them. More importantly, MAZUERA stated that at no time during the *entire course of events* did anyone apprise her of her *Miranda* rights and that she was first informed of them when she appeared before the Magistrate for arraignment. The Defendant also stated that the agents would not let her leave the kitchen and that she was not allowed to go to the bathroom by herself. Furthermore, MAZUERA informed the court that Inspector Cordero threatened her and told her that if she would not talk about the bills, she would spend fifteen years in jail and never see her children again.

ARIAS also testified that the agents entered the apartment without permission. He denied both being informed of his *Miranda* rights as well as making the statements concerning the counterfeit bills at the apartment. Rather, he stated that he was told that he would have to cooperate and when he replied that he did not know anything, the agents threatened not only to hit him, but also to put him in jail for fifteen years and take away his children.

Both of the Defendants stated that they went to the Secret Service office in Fort Lauderdale because they felt as though they had to and could not refuse. MAZUERA denied ever having made any statements to the agents on the way there. In addition, both Defendants informed the court that they gave their statements under duress in that they were again threatened by the agents and told what to write.

Although *Miranda* warnings were written in Spanish on top of the pages containing their statements, both Defendants claimed that they did not read them. ARIAS, however, did testify that he was informed of his *Miranda* rights at the office and that the information contained in his written statement was true.

## I. ENTRY INTO APARTMENT

 The principle protection against intrusions into the dwellings of individuals is the warrant requirement imposed on agents of the government who seek to enter a home for the purpose of search or arrest. *Welsh v. Wisconsin,* 466 U.S. 740, 104 S.Ct. 2091, 80 L.Ed.2d 732 (1984). Entry into a home to conduct a search or make an arrest, therefore, is unreasonable under the Fourth Amendment unless done pursuant a warrant. *Payton v. New York,* 445 U.S. 573, 100 S.Ct. 1371, 63 L.Ed.2d 639 (1980). Consistent with these principles a search or seizure carried out on a suspect's premises without a warrant is *per se* unreasonable unless the police can show "exigent circumstances." *Steagald v. United States,* 451 U.S. 204, 101 S.Ct. 1642, 68 L.Ed.2d 38 (1981).

 Given the nature of this case and the facts as they have been presented, the court finds that "exigent circumstances" did exist at the time the Secret Service and Postal Inspectors entered into the Defendants' apartment. As there was a distinct possibility that a key piece of evidence, that is, the counterfeit bills, may have been destroyed or craftily hidden by the Defendants, entry into the dwelling without a warrant was permissible for this limited purpose. The larger question remains, however, whether the Defendants consented to the search of their apartment by the Government and properly waived their constitutional rights.

## II. MIRANDA WAIVER AND CONSENT SEARCH

### Waiver

 The Fifth Amendment of the United States Constitution provides that an individual shall not "be compelled in any criminal case to be a witness against himself." In *Miranda v. Arizona,* 384 U.S. 436, 467, 86 S.Ct. 1602, 1624, 16 L.Ed.2d 694 (1966), the Supreme Court recognized that custodial interrogations, by their very nature, generate "compelling pressures which work to undermine the individual's will to resist and to compel him to speak where he would not otherwise do so freely." To combat this inherent compulsion, *Miranda* imposed an obligation on the government, that prior to the initiation of questioning, a suspect must be fully apprised of the state's intention to use his statements, and must inform him of his rights to remain silent and to have counsel present. *Id.* at 468–70, 86 S.Ct. at 1624–26.

A suspect, however, may waive his Fifth Amendment privilege "provided that the waiver is made voluntarily, knowingly and intelligently." *Id.* at 444, 86 S.Ct. at 1612. The inquiry into whether a waiver is coerced or made under duress has two distinct dimensions. *Edwards v. Arizona,* 451 U.S. 477, 101 S.Ct. 1880, 68 L.Ed.2d 378 (1981). These two dimensions were recently explained in *Moran v. Burbine,* 475 U.S. 412, 421, 106 S.Ct. 1135, 1141, 89 L.Ed.2d 410 (1986):

> First, the relinquishment of the right must have been voluntary in the sense that it was the product of a free and deliberate choice rather than intimidation, coercion, or deception. Second, the waiver must have been made with a full awareness of both the nature of the right being abandoned and the consequences of the decision to abandon it. Only if the "totality of the circumstances surrounding the interrogation" reveal both an uncoerced choice and the requisite level of comprehension may a court properly conclude that the *Miranda* rights have been properly waived.

### Consent Search

 Consent searches are often utilized by law enforcement agents when evidence of illegal activity if present, but they feel that they do not have time to get a warrant or lack probable cause to arrest or search. *Schneckloth v. Bustamonte,* 412

U.S. 218, 93 S.Ct. 2041, 36 L.Ed.2d 854 (1973). Consequently, a search conducted pursuant to a valid consent is constitutionally permissible. *Vale v. Louisiana,* 399 U.S. 30, 90 S.Ct. 1969, 26 L.Ed.2d 409 (1972). The question of whether a consent to a search was voluntary or was the product of coercion or undue influence is determined from the "totality of the circumstances." *Schneckloth, supra* 412 U.S. at 227, 93 S.Ct. at 2048. In examining all circumstances, the method and manner of police questioning as well as the subjective state of the person who consents must be taken into account. *Id.* at 229, 93 S.Ct. at 2049. "In sum, there is no reason for us to depart in the area of consent searches, from the traditional definition of 'voluntariness.' " *Id.*

## CONFLICTING TESTIMONY AND PREPONDERANCE OF EVIDENCE

■ In the present case the court is confronted with highly conflicting testimony which bears significantly on both the issue of the Defendants' waiver of *Miranda* rights as well as their consent to the agents' search of their apartment. While it must be recognized that both parties have much to gain by propounding their version as to what happened on August 30, 1990, the undersigned finds itself in the uneasy and difficult position of having to make a credibility determination with respect to the testimony presented before it. Taking all relevant facts into consideration and in the totality of circumstances, the court is of the opinion that the Government has met its burden of proving by a preponderance of the evidence, *Colorado v. Connelly,* 479 U.S. 157, 168–69, 107 S.Ct. 515, 522–23, 93 L.Ed.2d 473 (1986), that the consent to search the apartment was voluntary and that the Defendants' waiver of *Miranda* rights was voluntary, knowing and intelligent.

**4.** One troubling aspect is the fact that a portion of MAZUERA's statement taken at the Secret Service office appears to be a word for word quote of a "standard" set of Miranda warnings.

■ Even if one were to assume that the inculpatory statements made by ARIAS at the apartment were done without the benefit of *Miranda* warnings, his admission that he was given subsequent *Miranda* warnings at the Secret Service office combined with his written statement would effectively cure any prior taint. *Oregon v. Elstad,* 470 U.S. 298, 105 S.Ct. 1285, 84 L.Ed.2d 222 (1985). Such a conclusion bears greatly, however, on the court's determination that the agents in question were not guilty of coercive or duress inducing procedures. Although illegal and oppressive police tactics such as threats of violence and the taking away of children are precisely what the Fourth and Fifth Amendments of the Constitution were designed to protect against, the court has trouble believing that such measures actually occurred in this instance.

Moreover, it is hard to accept the contention that the law enforcement agents in question, in light of their years of experience, would totally neglect informing the Defendants' their constitutional rights. MAZUERA's testimony that she was never given a *Miranda* warning until appearing before the Magistrate appears suspect in light of the fact that *Miranda* rights were printed on top of the page in which she wrote her statement and ARIAS's admission that he was given *Miranda* warnings while in the same room as MAZUERA at the Secret Service office.

## CONCLUSION

Although it must be conceded that parts of the Government's witnesses' testimony also appears suspect[4], the court's conclusion still remains that in the totality of circumstances, the Government has met its burden of proving by a preponderance of the evidence that the Defendants consented to the search of their apartment and that they voluntarily, knowingly and intelligently waived their *Miranda* rights.

Consequently, there remains the possibility that this portion of the statement may have been dictated to her.

In view of all the foregoing, it is hereby ORDERED and ADJUDGED that

(1) The Defendant's, FATIMA MAZU-ERA, Motion to Suppress is DENIED.

(2) The Defendant's, FABIO ARIAS, Motion to Suppress is DENIED.

DONE and ORDERED.