UNITED STATES of America

v.

Stephen A. KNOX.

No. 4:CR–91–74.

United States District Court,
M.D. Pennsylvania.

Oct. 11, 1991.

William Behe, Asst. U.S. Atty., Harrisburg, Pa., for U.S.

Joshua D. Lock, Harrisburg, Pa., for Stephen A. Knox.

## MEMORANDUM

McCLURE, District Judge.

### BACKGROUND

Defendant Stephen Knox has been charged in a two-count indictment with violations of 18 U.S.C. § 2252(a)(2) and (4). The indictment alleges that Knox "knowingly received through the mail visual depictions of ... minor females lasciviously displaying their genitals and pubic area" and that he "knowingly possessed three or more [of the above-mentioned] matter that had been mailed ... in interstate or foreign commerce."

On June 5, 1991, Knox filed a bevy of pre-trial motions, with supporting brief. The government filed a timely opposing brief, requesting that all of Knox's motions be denied without a hearing, except for his motion to suppress evidence allegedly tainted by the seizure of Knox's mail. Subsequently, by telephone conference call, counsel for the defendant and the government advised the court that they had stipulated to a pretrial hearing by the court for the purpose of determining whether any of the visual depictions contained in three videotapes "involves a minor engaged in sexually explicit conduct" within the meaning of 18 U.S.C. §§ 2252(a)(2) and (4). The United States has agreed to base its prosecution upon these three videotapes which were seized from Knox's apartment. By Order dated July 22, 1991, the court approved the stipulation and scheduled a hearing for both Knox's motion to suppress and to determine the legal consequences of the visual depictions contained on the three videotapes. In the same order, the court noted that it would rule on Knox's other pretrial motions subsequent to the conclusion of the evidentiary hearing, but before the commencement of any non-jury trial.

The aforementioned evidentiary hearing was held on September 6, 1991. At the

hearing, the court heard the testimony of Luther Thomas, a Customs Inspector stationed in Philadelphia, and Solon Chamberlain, a United States Customs Service Special Agent involved in the Knox investigation. Portions of the three videotapes were also viewed during the hearing.[1]

## DISCUSSION

### A. Motion to Suppress.

Knox has moved to suppress evidence 1) seized during the search of his residence and 2) allegedly tainted by the illegal seizure of his mail. However, since the investigators were acting pursuant to a search warrant, Knox cannot argue that the evidence seized at his residence should be excluded from trial because the investigators lacked probable cause. See *United States v. Leon*, 468 U.S. 897, 104 S.Ct. 3405, 82 L.Ed.2d 677 (1984) (fourth amendment exclusionary rule does not bar the use of evidence obtained by officers acting in reasonable reliance on a search warrant issued by a detached and neutral magistrate but ultimately found to be unsupported by probable cause).

### 1. *The Search Warrant.*

At his hearing, Knox presented, for the first time, the argument that the warrant was obtained through prejudicial and misleading information contained in the affidavit of Solon Chamberlain. Specifically, he claims that three pages of general information in the affidavit regarding "preferential child molesters" were gratuitous and prejudicial, and prevented the magistrate from making an independent and dispassionate determination as to the existence of probable cause.[2] In the affidavit, Chamberlain asserts that the information concerning preferential child molesters is based on his training and experience. Since Knox had previously been convicted for possession of child pornography and

was known to be a pedophile, this information was properly submitted to the magistrate as background information pertaining to the modus operandi of pedophiles. See *United States v. Fannin*, 817 F.2d 1379, 1381–1382 (9th Cir.1987) (in weighing the evidence supporting a request for a search warrant, a magistrate may rely on the conclusions of experienced law enforcement officials regarding where evidence of a crime is likely to be found) (citations omitted). The information was also helpful to the magistrate in determining the scope of the warrant as well as the existence of probable cause.

Chamberlain's affidavit also stated that United States Customs previously intercepted an air mail envelope addressed to Knox from Ophelia Editions, located in the Netherlands, containing "listings of publications for sale and photographic depictions of minor females, nude, clothed, and semi-clothed on posters and postcards set #1, set #2, set #3, and set #4." Knox contends that the affidavit was misleading because it omits Ophelia's disclaimer which states, "[n]one of the materials sold by Ophelia Editions violates any laws …" However, this disclaimer goes on to state that Ophelia Editions will not ship certain items "to countries in which such items may be prosecutable under repressive or dangerously vague laws (e.g. U.S., Canada, U.K.)."

"Insignificant and immaterial misrepresentations or omissions will not invalidate a warrant." *United States v. Ofshe*, 817 F.2d 1508, 1513 (11th Cir.1987) (citing *Franks v. Delaware*, 438 U.S. 154, 98 S.Ct. 2674, 57 L.Ed.2d 667 (1978)). The disclaimer taken in its entirety is insignificant and its omission did not create a misleading impression regarding the nature of the material believed to be in Knox's apartment. On the contrary, the inclusion of the dis-

---

**1.** Prior to the hearing the government filed a memorandum of law (record document #16, filed July 18, 1991) regarding the applicability of 18 U.S.C. §§ 2252 and 2256 to instances where the minor's genitals are not exposed and defendant filed a supplemental brief (record document #17, filed July 19, 1991) on the same

issue. On the date of the hearing, defendant filed a supplemental pretrial motion (record document #24, filed September 6, 1991).

**2.** The information is clearly of a general nature, and does not specifically refer to Knox.

claimer in its entirety would more likely have affirmed the attested nature of the materials believed to be in Knox's apartment.

■ Finally, Knox's argument that there was insufficient information to support the magistrate's conclusion that there was evidence of a crime or contraband in his apartment is belied by the record. Knox had been previously convicted for receiving child pornography through the mail. An international mailing involving suspected child pornography was addressed to Knox. Another international mailing involving suspected child pornography contained a check made out by Knox with instructions concerning concealment of the titles of films. This second mailing was addressed to a "J. Richard Scott" at an address substantially the same as Knox's address.

### 2. The Seizure of Knox's Mail.

■ Regardless of the adequacy of the warrant itself, evidence obtained from Knox's residence would nevertheless be inadmissable at trial if the seizure of the international mailings by customs inspectors was, as Knox contends, illegal. Two items of mail were seized by U.S. Customs at the U.S. Customs International Mail Branch in Philadelphia. This was done without a warrant, and information obtained from these seizures was used, as stated above, to secure the warrant to search Knox's residence. If the seizure by the customs inspectors was illegal, all evidence derived from the illegal seizure would be tainted and inadmissable.

■ Customs Inspector Luther Thomas testified that immediately after entering the country international mail is routed directly to the mail branch of U.S. Customs in Philadelphia, where it is examined for the purpose of collecting taxes and duties, and for the purpose of preventing the introduction of contraband into this country. Thomas stated that, when examining international mail, a customs inspector must determine whether the letter is simply correspondence or something more.[3] An inspector will first feel the envelope to determine if it is unduly thick or contains odd shapes. He will then refer to the origin of the envelope and the return address, if any.

Based on this examination, the customs inspector will open the envelope if he has a "reasonable suspicion" that the envelope contains something more than correspondence. This practice meets the requirements of statutory and constitutional law. 19 U.S.C. § 482; United States v. Sandoval Vargas, 854 F.2d 1132 (9th Cir.1988); United States v. Most, 789 F.2d 1411 (9th Cir.1986); United States v. Nguyen, 701 F.Supp. 747 (D.Haw.1988). "Reasonable suspicion" is a milder standard than probable cause. This less stringent standard is applied because

> [i]nspection of mail from abroad is a border search for which neither a warrant nor probable cause is required. United States v. Ramsey, 431 U.S. 606, 619–23, 97 S.Ct. 1972, 1980–82, 52 L.Ed.2d 617 (1977); see United States v. Whiting, 781 F.2d 692, 695 (9th Cir.1986); United States v. Alfonso, 759 F.2d 728, 733 (9th Cir.1985).
>
> Such searches are considered reasonable under the Fourth Amendment simply by virtue of the fact that they occur at the border.

United States v. Most, supra, 789 F.2d at 1414.

■ Thomas testified that in the first week of March 1991 he received seven identical envelopes with no return address from the same postal source in the Netherlands. The envelopes were unusually large and felt as if they contained something similar to a magazine. Significantly, the Netherlands is a known source of child pornography, and one of the envelopes was addressed to defendant Stephen Knox, for whom they had previously intercepted child pornography. This envelope was found to contain solicitations for what customs agents believed to be child pornography. A second envelope from the set was opened to verify the contents of the other six en-

---

**3.** If the envelope contains something other than or in addition to correspondence, a tax or duty may be due. There is also the possibility that the additional material is contraband.

velopes. The contents of this envelope was identical to the one addressed to Knox.

Subsequent to this seizure, Thomas had the opportunity to examine several similar envelopes from the same postal source in France. One of these envelopes was addressed to a J. Richard Scott at an address substantially similar to Knox's address.[4] In addition, the envelope addressed to Scott felt as if it contained something more than correspondence. Significantly, France is a known source of narcotics and the envelope did not indicate a return address. Based on this information, Thomas opened the envelope addressed to J. Richard Scott, which was found to contain solicitations for suspected child pornography and a check from Knox with instructions concerning concealing the titles of films.

Based on these facts, it is clear that in both instances Thomas had reasonable cause to suspect that the envelopes he opened contained something more than correspondence. See *United States v. Most, supra* (court found reasonable suspicion when package was coming from Thailand, a known source of drugs, and customs agent suspected that package contained something extra because the label described an unusually cheap article).

B. Motion to Dismiss

Knox has moved to dismiss arguing that (1) the indictment improperly attempts the extra-territorial application of 18 U.S.C. § 2252(a)(2) and (4); (2) the indictment fails to allege violations of the statutory prohibitions of sexually explicit conduct and/or mailing; (3) subsections (a)(2) and (4) of § 2254 are void for vagueness; (4) Count II of the indictment, alleging possession of "visual depictions of minors engaging in sexually explicit conduct", violates his right to privacy under the first and ninth amendments; and (5) the indictment fails to meet the threshold requirement of sexually explicit conduct.

As to extra-territoriality, Knox maintains the relevant statute does not apply to depictions of foreign nationals produced in foreign countries. However, Knox is not being prosecuted for producing child pornography in a foreign country, but, rather, for receiving child pornography through the mails, pursuant to 18 U.S.C. § 2252, which expressly covers materials shipped in interstate or *foreign* commerce.[5]

Knox's argument concerning the allegations in the indictment fails because the indictment does allege violations of the statutory prohibitions of sexually explicit conduct and mailing.

Knox also argues that § 2254(a)(2) and (4) are void for vagueness as applied to the facts alleged in the indictment. However, this statute has been determined to be constitutionally precise, *United States v. Wiegand*, 812 F.2d 1239 (9th Cir.1987), cert. denied, 484 U.S. 856, 108 S.Ct. 164, 98 L.Ed.2d 118 (1987), and the indictment clearly charges conduct prohibited by §§ 2252(a)(2) and (4).

Knox has moved to dismiss Count II of the indictment for violations of his right to privacy under the First and Ninth Amendments. These arguments, however, lack merit. See *New York v. Ferber*, 458 U.S. 747, 102 S.Ct. 3348, 73 L.Ed.2d 1113 (1982) (child pornography is not protected by the First Amendment); *Osborne v. Ohio*, 495 U.S. 103, 110 S.Ct. 1691, 109 L.Ed.2d 98 (1990) (possession of child pornography not a protectable privacy interest).

Knox's argument concerning the threshold requirement of sexually explicit conduct fails as stated because it is not directed at the indictment itself. Instead, it challenges the sufficiency of the government's evidence, a matter which is uniquely suited for trial and not for disposition by a motion to dismiss. *United States v. Shober*, 489 F.Supp. 393, 412 (E.D.Pa.1979).

---

**4.** The envelope addressed to J. Richard Scott read "210 West Hamilton Avenue, # 108, State College, Pennsylvania 16801," while Knox's address is 210 East Hamilton Avenue, # 25, State College, Pennsylvania 16801.

**5.** In any event, the government's agreement to base its prosecution of Knox on three videotapes, which appear to have been created in the United States, negates this claim.

However, as noted above, counsel for the defendant and the government stipulated to a pretrial hearing to determine whether the producing of any of the visual depictions contained in three videotapes "involves the use of a minor engaging in sexually explicit conduct" within the meaning of 18 U.S.C. § 2252(a)(2) and § 2252(a)(4). See *United States v. McCormick*, 675 F.Supp. 223 (M.D.Pa.1987) (in a procedurally similar child pornography case, court denied defendant's motion to dismiss the indictment based on the contention that the government's evidence failed to depict sexually explicit conduct within the meaning of 18 U.S.C. § 2256(2)(E)). Although this was an unusual request, as the defendant has waived his right to a jury trial, and the court would, in any event be required to view the videotapes at trial, the videotapes were viewed at the hearing held on September 6, 1991.

Solon Chamberlain, a United States Customs Service Special Agent involved in the Knox investigation, testified that among the evidence seized at Knox's residence on April 2, 1991, were three videotapes produced by the Nather Company (hereinafter referred to as the "Nather tapes"). The Nather Company is located in Las Vegas, Nevada, and apparently creates and markets videotapes with the specific intention of pandering to the peculiar lusts of pedophiles. The videotapes are marketed along with a newsletter indicating that they are legal because they contain neither sex nor nudity. For example, a copy of one of the Nather Company newsletters seized at Knox's apartment and entered into evidence reads as follows:

Ever since our holiday release last December of "Nubile Nymphs" (# 8023), you have been asking when our next release would be ready. Right now!

That's right. Our latest completely legal video of teen and pre-teen girls, ages 12–16, is ready right now and its called "Sassy Sylphs".

But I have to be honest with you. "Sassy Sylphs" is not the best "young" video we have ever done. No, its only the second best of the dozens we have made! Just take a look at the enclosed photo of one of the "stars" of this video and you can get a hint of its power. "Sassy Sylphs" will blow your mind so completely you'll be begging for mercy.

Just look at what we have in this incredible tape: about 14 girls between the ages of 11 and 17 showing so much panty and ass you'll get dizzy. There are panties showing under shorts and under dresses and skirts; there are boobs galore and T-back (thong) bathing suits on girls as young as 15 that are so revealing it's almost like seeing them naked (some say even better).

And best of all, this tape is completely legal. There is absolutely no sex or nudity anywhere, so it is safe to ship, own and trade.

"Sassy Sylphs" is an hour long and costs only $65. I would pay *twice* that amount myself for just the sequence in the video featuring the girl in the enclosed photo!! The only problem is that no other company in the world makes videos like this so I have to make them myself.

Portions of each of the three Nather tapes were viewed by the court. Each tape was stopped after several minutes of viewing, and counsel for the parties stipulated that the remainder of the tape contained the same or similar material. In fact, all three tapes contained the same or similar material. The tapes were comprised of numerous vignettes, typically involving a teen or pre-teen girl dressed in either a skirt, shorts or bathing suit. Most, if not all, of the vignettes were set to music. In each vignette the subject of the video would strike various poses which were obviously being directed by someone off-camera. Whenever a particular pose revealed the girls underpants or the area surrounding her genitals, the camera would zoom in on the area. In the course of each vignette, more than a substantial amount of time was spent focusing in on these areas, as well as the girl's buttocks.

Knox contends that the Nather tapes do not involve "a minor engaging in sexually explicit conduct" within the meaning of 18 U.S.C. § 2252(a)(2) and § 2252(a)(4). Sexu-

ally explicit conduct is defined as, inter alia, the "lascivious exhibition of the genitals or pubic area of any person." 18 U.S.C. § 2256(2)(E). Knox maintains that the Nather tapes do not contain any exhibition of the genitals or pubic area, and therefore do not contain sexually explicit conduct.

In *United States v. Dost*, 636 F.Supp. 828 (S.D.Cal.1986), aff'd. sub nom, *United States v. Wiegand*, 812 F.2d 1239, 1244 (9th Cir.1987), the district court formulated six factors to be considered when determining whether a visual depiction of a minor constitutes a lascivious exhibition of the genitals or pubic area.[6] In *United States v. Villard*, 885 F.2d 117 (3d Cir.1989), this circuit adopted the *Dost* factors "as a means of determining whether a genital exhibition is lascivious." *Id.* at 122.

Unfortunately, these cases provide no guidance in the instant matter. The focal point of Knox's argument is the existence of an exhibition, not the character or lasciviousness of the exhibition.[7] Sexually explicit conduct covers exhibitions of the "genitals *or* pubic area." 18 U.S.C. § 2256(2)(E) (emphasis added). Therefore, an exhibition of the genitals is not required. A prosecution under the statute could proceed on the theory of an exhibition of the pubic area alone. The government is proceeding under such a theory with regards to the Nather tapes.

This is a case of first impression. To this date, no court has addressed the applicability of the statute with respect to an exhibition of the pubic area. In order to determine if the Nather tapes contain such an exhibition, the meaning of an "exhibition of the pubic area" must first be determined. The legislative history provides no guidance in this matter. Consequently, we must look to the plain meaning of the words themselves.

Exhibit means "to present to view: show, display ... to show publicly: put on display in order to attract notice to what is interesting or instructive." *Webster's New International Dictionary, Unabridged,* (1976). Pubic is defined as "of, relating to, or lying in the region of the pubes or the pubis." *Id.* Although pubes and pubis have different definitions, they both refer to the same area of the human anatomy. Pubes refers to the "hair which appears upon the lower part of the hypogastric region at the age of puberty" or "[t]he lower part of the hypogastric region." *Id.* Pubis is defined as "the ventral and anterior of the three principal bones composing either half of the pelvis." *Id.* Thus, the pubic area would appear to be the region of the human anatomy in close proximity to the genitals.

It follows that an exhibition of the pubic area would occur where there is a display of the region in close proximity to the genitals. The Nather tapes were fraught with instances of the camera zooming in on the area of the girl's genitals. Although in every instance the girl's genitals were covered by either underpants or a bathing suit, the area in close proximity to the genitals, specifically the uppermost portion of the inner thigh area closest to the girl's genitals, was clearly exposed. Based on the aforementioned, the court cannot conclude as a matter of law that the Nather tapes do not contain an exhibition of the pubic area. Accordingly, defendant's motion to dismiss the indictment because the Nather tapes fail to contain an "exhibition of the genitals or pubic area," 18 U.S.C. § 2256(2)(E), will be denied.

Since the parties make no arguments concerning the lascivious nature of the Nather tapes, the court refuses to render an opinion on this issue at this time, waiting until the conclusion of the trial to make such a determination.

---

**6.** The court also stated that the trier of fact should look to any other factor which may be relevant in a particular case. *United States v. Dost*, supra, at 832. On appeal the Ninth Circuit Court of Appeals stated that the standard employed by the district court in *Dost* was overgenerous. *United States v. Wiegand*, 812 F.2d 1239, 1244 (9th Cir.1987). However, the court did not clarify the factors to be applied.

**7.** Consequently, the court is not required to make any determination whatsoever regarding the lascivious nature of the Nather tapes.