**UNPUBLISHED**

UNITED STATES COURT OF APPEALS
FOR THE FOURTH CIRCUIT

**No. 13-4507**

UNITED STATES OF AMERICA,

             Plaintiff - Appellee,

        v.

YVONNE CASTLE TAYLOR,

             Defendant - Appellant.

Appeal from the United States District Court for the District of
Maryland, at Baltimore.  George L. Russell III, District Judge.
(1:13-cr-00080-GLR-1)

Submitted:  August 8, 2014          Decided:  September 24, 2014

Before WYNN and DIAZ, Circuit Judges, and HAMILTON, Senior
Circuit Judge.

Affirmed by unpublished per curiam opinion.

Lance C. Hamm, Houston, Texas, for Appellant.  Rod J.
Rosenstein, United States Attorney, Evan T. Shea, Assistant
United States Attorney, OFFICE OF THE UNITED STATES ATTORNEY,
Baltimore, Maryland, for Appellee.

Unpublished opinions are not binding precedent in this circuit.

PER CURIAM:

Pursuant to a plea agreement, Yvonne Castle Taylor (Taylor) conditionally pleaded guilty to the charge of failing to file a required report of international transportation of currency in violation of 31 U.S.C. § 5316, reserving the right to challenge on appeal the district court's denial of her motion to suppress. She was sentenced to five years' probation and fined $3,000.00. On appeal, she argues, first, that the district court erred when it denied her motion to suppress and, second, that venue was improper in the District of Maryland. For the reasons stated below, we affirm.

I

A

On the morning of May 28, 2011, Homeland Security Investigations (HSI) Special Agent Roy Rutherford (Agent Rutherford), who was stationed in Atlanta, Georgia, received a phone call from HSI Special Agent Mary Horn (Agent Horn), who was stationed in Baltimore, Maryland. During the call, Agent Horn indicated that she had received a tip that Taylor would be attempting to smuggle a large amount of currency out of the United States that day while traveling from Baltimore to Montego Bay, Jamaica. According to Agent Horn, Taylor was scheduled to fly from Baltimore-Washington International Airport (BWI) to

Sangster International Airport (MBJ) in Montego Bay, connecting through Atlanta Hartsfield-Jackson International Airport (Atlanta Hartsfield).[1]   Based on this information, Agent Rutherford contacted the United States Customs and Border Patrol (CBP) Passenger Analysis Unit (PAU) duty officer at Atlanta Hartsfield and asked her to assign two CBP officers the task of interviewing Taylor as she boarded the plane bound for MBJ.   In response, the CBP PAU duty officer instructed CBP Officers Abdullah Shahbaaz (Officer Shahbaaz) and Christopher Horton (Officer Horton) to interview Taylor before she boarded the plane.

Later that morning, Agent Rutherford received another call from Agent Horn.   During this call, Agent Horn indicated that Taylor was searched by Transportation Security Administration officers at BWI and that no "bulk sum of currency [was found] on her person."   (J.A. 135).   After receiving this information, Agent Rutherford contacted the CBP PAU duty officer at Atlanta Hartsfield and asked her to call off the operation concerning Taylor because no bulk sum of currency was found on Taylor's person during the search at BWI.

---

[1] More specifically, Taylor was scheduled to fly on Airtran Airlines, departing BWI at 8:32 a.m. and arriving at Atlanta Hartsfield at 10:26 a.m., and then departing Atlanta Hartsfield at 12:30 p.m. and arriving at MBJ at 2:24 p.m.

The CBP PAU duty officer, who has the independent authority to order passenger interviews, declined to call off the operation. Instead, she informed Officer Shahbaaz of the results of the BWI search and asked him, "as a courtesy, just to go and talk to [Taylor before she boarded the flight to MBJ], again as a courtesy to whomever sent the intel." (J.A. 83).

The flight to MBJ was scheduled to depart from Gate C-14. Prior to the scheduled departure, Officers Shahbaaz and Horton proceeded to the gate, positioning themselves just inside the jetway, about six or seven steps past the threshold that passengers must cross when they leave the terminal. Because all they had was Taylor's name, Officers Shahbaaz and Horton decided to stop and interview all passengers as they boarded the flight, asking them "about carrying effects aboard, money, declaring any type of gifts or whatever." (J.A. 70).

Taylor was about the tenth person interviewed by Officer Shahbaaz. He initially asked her if she was "familiar with the currency reporting requirements to enter or exit the country." (J.A. 72). When she hesitated, Officer Shahbaaz asked Taylor how much money she was carrying. Taylor hesitated for a moment, looked up at the ceiling, and responded that she had $3,000.00. Because this response was not in the same "rhythm that the other passengers . . . [gave]," Officer Shahbaaz repeated the question, and this time Taylor looked out the jetway window

- 4 -

before saying that she was carrying $2,000.00. Taylor's demeanor and her inconsistent answers caused Officer Shahbaaz to ask Taylor if she was sure how much money she had on her person, and Taylor responded that she did not know how much money she had. Officer Shahbaaz asked "further questions specifically concerning money, and [Taylor] then stated something to the effect that it was more than" $100,000.00. (J.A. 73). Officer Shahbaaz then asked Taylor how she knew that she was carrying more than $100,000.00, and Taylor responded, "[T]hey didn't tell me how much money it was." (J.A. 73). When Officer Shahbaaz asked her where the money was, Taylor pointed to her midsection and said "it's here," implying that the money was concealed under her clothing.

At this point, Officers Shahbaaz and Horton decided to escort Taylor to a "secondary area," an area separate from the public areas of the airport, to conduct a pat-down search of her person and to confirm the exact amount of cash. (J.A. 75).[2] As they were proceeding to the secondary area, Officer Shahbaaz contacted Agent Rutherford to inform him that Taylor had

---

[2] Of note, Officers Shahbaaz and Horton never asked Taylor if she filled out a Report of International Transportation of Currency or Monetary Instruments Form (CMIR Form), which was required for her to transport the money she was carrying abroad. See, e.g., 31 U.S.C. § 5316 (failing to file a required report of international transportation of currency).

indicated that she was in possession of at least $100,000.00. In response, Agent Rutherford indicated that he would report to the secondary area to assist.

At the secondary area, the pat-down search was conducted by CBP Officer Alla Swords (Officer Swords) in a separate room in the presence of another CBP female officer. During the pat-down search, Officer Swords recovered approximately $102,000.00 from Taylor's clothing. Following this recovery, Officer Swords escorted Taylor to a conference room where Agent Rutherford was present.

During a recorded interview, Agent Rutherford advised Taylor of her Miranda[3] rights, but Taylor indicated that she did not want to waive those rights, so the recorded interview ended. Thereafter, Agent Rutherford began to fill out a United States Marshal Arrest and Booking Form. He asked Taylor for basic information, such as her name, date of birth, address, phone number, and emergency contact information. While he was filling out this form, Taylor said "she had done a trip with bulk sums of currency on two prior occasions, and that the money was going into a bank." (J.A. 143). At this point, Agent Rutherford turned the recorder back on and informed Taylor that the only way he could talk to her is if she understood her Miranda rights

_____

[3] Miranda v. Arizona, 384 U.S. 436 (1966).

- 6 -

and waived them.  Taylor indicated that she wanted to consult with an attorney, so the recorded interview ended and Agent Rutherford finished the booking process.

B

On June 2, 2011, a federal grand jury sitting in the District of Maryland returned a one count indictment charging Taylor with bulk cash smuggling in violation of 31 U.S.C. § 5332(a).  On June 1, 2012, Taylor filed a motion to suppress the money seized from her and the statements she made during the booking process on May 28, 2011.  She filed a supplement to this motion on November 16, 2012.  Following a hearing, the district court denied the motion to suppress.  In its oral ruling, the district court first concluded that the questioning of Taylor on the jetway was reasonable under controlling border stop and search precedent.  The district court next concluded that there was probable cause to arrest Taylor on the jetway for bulk cash smuggling.  Finally, the district court concluded that there was no Miranda violation in the case because Taylor's incriminating statements were not made in response to police questioning.

On February 22, 2013, Taylor and the government entered into a plea agreement.  For her part, Taylor agreed to plead guilty to the charge of failing to file a required report of international transportation of currency in violation of 31 U.S.C. § 5316, reserving the right to appeal the district

- 7 -

court's denial of her motion to suppress. She also agreed to waive any right to appeal her "conviction on any other ground." (J.A. 323). For its part, the government agreed to dismiss the indictment charging bulk cash smuggling.

On February 25, 2013, a one count criminal information was filed charging Taylor with the § 5316 offense. That same day, the district court held an arraignment at which Taylor entered her conditional plea of guilty to the criminal information. At the hearing, Taylor stated she understood that, although she reserved the right to appeal the denial of her motion to suppress, she waived her right to appeal "her conviction . . . on any other ground." (J.A. 347). As a result of the conditional guilty plea to the § 5316 offense, the district court dismissed the indictment charging bulk cash smuggling.

A sentencing hearing was held on June 21, 2013. At the hearing, Taylor was sentenced to five years' probation and fined $3,000.00. Judgment was entered on June 24, 2013, and Taylor noted a timely appeal on July 1, 2013.

II

Taylor argues that the district court erred when it denied her motion to suppress. We review the district court's factual findings regarding the motion to suppress for clear error, and the district court's legal conclusions de novo. United States

v. Burgess, 684 F.3d 445, 452 (4th Cir.), cert. denied, 133 S. Ct. 490 (2012). When a suppression motion has been denied by the district court, we construe the evidence in the light most favorable to the government. United States v. Foster, 634 F.3d 243, 246 (4th Cir. 2011). We also defer to the district court's credibility findings. United States v. Griffin, 589 F.3d 148, 150-51 n.1 (4th Cir. 2009).

The Fourth Amendment protects individuals from unreasonable searches and seizures. U.S. Const., Amend IV. Routine border stops and searches may be conducted without probable cause or reasonable articulable suspicion, in order to regulate collection of duties and prevent introduction of contraband. United States v. Montoya de Hernandez, 473 U.S. 531, 538 (1985). Border searches have been considered to be reasonable by definition because the person or item in question came into the United States from elsewhere. United States v. Ramsey, 431 U.S. 606, 619 (1977).

At the time she was stopped on the jetway, Taylor was at the functional equivalent of an international border, even though she was leaving as opposed to entering the United States. See Almeida-Sanchez v. United States, 413 U.S. 266, 273 (1973) ("[A] search of the passengers and cargo of an airplane arriving at a [United States] airport after a nonstop flight from [abroad] would clearly be the functional equivalent of a border

search."); <u>United States v. Oriakhi</u>, 57 F.3d 1290, 1295-97 (4th Cir. 1995) ("[W]e join the several other circuit courts which have held that the <u>Ramsey</u> border search exception extends to all routine searches at the nation's borders, irrespective of whether persons or effects are entering or exiting from the country."). Thus, under the precedent of <u>Montoya de Hernandez</u>, <u>Ramsey</u>, <u>Almeida-Sanchez</u>, and <u>Oriakhi</u>, there is no question that the initial stop and questioning of Taylor on the jetway complied with the Fourth Amendment.

Taylor argues that the district court erred when it concluded that there was probable cause to arrest her on the jetway for bulk cash smuggling. She posits that the subsequent search of her person and her subsequent incriminating statements were the fruits of an illegal arrest. The government's response is two-fold. First, it argues that there was probable cause to arrest Taylor on the jetway for the charge of bulk cash smuggling. Alternatively, it argues that the subsequent search of Taylor was a permissible border search. Because we agree with the government's probable cause argument, we need not address its alternative border search argument.

A police officer may make a warrantless arrest in a public place if the officer has probable cause to believe that the individual is or will soon be involved in criminal activity. <u>United States v. Dickey-Bey</u>, 393 F.3d 449, 453 (4th Cir. 2004).

The requirement of probable cause may be satisfied by "facts and circumstances within the officer's knowledge that are sufficient to warrant a prudent person, or one of reasonable caution, in believing, in the circumstances shown, that the suspect has committed, is committing, or is about to commit an offense." Id. (quoting Michigan v. DeFillippo, 443 U.S. 31, 37 (1979) (internal quotation marks omitted)). We consider under the "totality of the circumstances" the question whether an arrest was supported by probable cause, affording "defer[ence] to the expertise and experience of law enforcement officers at the scene." Id.

The district court concluded that the following facts gave Officers Shahbaaz and Horton probable cause to arrest Taylor for bulk cash smuggling: (1) Taylor hesitated and looked away when she was asked how much money she was carrying; (2) Taylor gave inconsistent answers concerning the amount of money she was carrying, culminating with her "more than $100,000.00" response, (J.A. 73); (3) someone else gave Taylor the money to carry abroad; and (4) the money was hidden on Taylor's person.

The thrust of Taylor's attack on the district court's probable cause analysis is that Officers Shahbaaz and Horton lacked probable cause to believe that she had not filed or she

- 11 -

did not intend to file the CMIR Form.[4]  This attack misses the mark.

Officers Shahbaaz and Horton were entitled to use their common sense and experience to infer from the concealment, Taylor's demeanor, her contradictory statements about the amount of money she was carrying, her lack of knowledge concerning the exact amount of money she was carrying, and the fact that someone else gave her a large sum of money to carry abroad, that Taylor had failed to file and/or intended not to file a CMIR Form.  Taylor's argument to the contrary simply ignores the reasonable inferences that Officers Shahbaaz and Horton were entitled to draw from the facts presented.  In short, at the time of her arrest on the jetway, Officers Shahbaaz and Horton had probable cause to arrest Taylor on the charge of bulk cash smuggling, as the district court so held.

---

[4] The charge of bulk cash smuggling is similar, but not identical to the charge of failing to file a required report of international transportation of currency.  See United States v. Tatoyan, 474 F.3d 1174, 1180-82 (9th Cir. 2007) (bulk cash smuggling and failing to file a required report of international transportation of currency do not merge under Blockburger v. United States, 284 U.S. 299 (1932) because each offense has an element that the other does not).  Relevant here, bulk cash smuggling requires that the defendant intend to fail to file the CMIR Form, while failing to file a required report of international transportation of currency requires that the defendant fail to file the required report.

Taylor also argues that venue was improper in the District of Maryland. The question of venue in a criminal prosecution is reviewed de novo. United States v. Wilson, 262 F.3d 305, 320 (4th Cir. 2001).

Under Rule 18 of the Federal Rules of Criminal Procedure, venue is proper "in [any] district where the offense was committed." Fed. R. Crim. P. 18. According to Taylor, because she was arrested while attempting to leave the United States from Atlanta, venue was proper in the Northern District of Georgia, not the District of Maryland.

Taylor's venue argument has insurmountable hurdles. First, by pleading guilty without reserving the right to challenge venue on appeal, she waived any right to challenge venue in this court. See United States v. Bundy, 392 F.3d 641, 650 n.3 (4th Cir. 2004) ("Where a defendant who pled guilty presents on appeal an issue that he did not even attempt to preserve by means of a conditional plea, we decline to entertain the appeal on the ground that the defendant's unconditional plea waived that issue altogether."); United States v. Calderon, 243 F.3d 587, 590 (2d Cir. 2001) (collecting cases and explaining that "[v]enue is not jurisdictional" and is waived by a "valid plea").

Second, a defendant who fails to clearly challenge venue in the district court waives the right to raise such issue on appeal. United States v. Stewart, 256 F.3d 231, 238 (4th Cir. 2001). In order to raise the issue of venue in the district court, a defendant is not required to file a written pleading, because such a requirement does not serve the two purposes of the contemporaneous objection rule--preserving judicial resources and preventing sandbagging. Id. at 238-39. Moreover, "[b]ecause proper venue is a constitutional right, waivers of venue rights through failure to object should not readily be inferred," id. at 238, and any "ambiguity as to the defendant's intent to waive venue [is] interpreted in favor of the defendant." Id. at 239.

In this case, the issue of venue was not raised in the district court, either orally or in writing, as Taylor apparently recognizes. Thus, the district court was not presented with an opportunity to rule upon any venue question. Nevertheless, Taylor asks us to address the merits of her venue argument, contending that she "should not suffer because [all of the parties, including the district court] missed the boat" on the venue issue. Appellant's Reply Br. at 11. We must decline this request. Simply put, Stewart clearly prevents us from addressing the merits of Taylor's venue argument. 256 F.3d at 238-39.

IV

For the reasons stated herein, the judgment of the district court is affirmed.

We dispense with oral argument because the facts and legal contentions are adequately presented in the materials before the court and argument would not aid the decisional process.

<u>AFFIRMED</u>